THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* ROBERT NEULIST, Respondent.

Second Department, December 10, 1973.

*William Cahn, District Attorney (Thomas R. Hession* of counsel), for appellant.

*Thomas A. Cassidy (Henry J. O'Hagan* of counsel), for respondent.

SHAPIRO, J. The defendant has been charged with the murder of his wife. At a pretrial hearing, the County Judge suppressed certain items of physical evidence which the People contend are necessary to their successful prosecution of this case (*People* v. *Neulist,* 72 Misc 2d 140). Hence, as permitted by statute (CPL 450.20, subd. 8; CPL 450.50), they have appealed from the suppression order.

### THE FACTS

At about 9:15 on the morning of May 12, 1971 the Nassau County Police received a telephone call from 20-year-old David Lucas reporting that he had found his mother, Liliane Neulist, dead in her bedroom in the family home in Plandome, New York. The first patrolman arrived at the scene within minutes of the call and found the decedent lying in bed, her face and head in a pool of blood. Shortly thereafter, and in response to a call from the patrolman, police detectives, including a Detective Wichmann, arrived, and at about 11:25 A.M. deputy medical examiners from the medical examiner's office also arrived at the Neulist home. The defendant, a dentist and the decedent's second husband, was called at his office and reached his home at about 11:45 A.M. Both he and his stepson David voluntarily answered Detective Wichmann's questions about their activities that morning and about the decedent's health. The defendant and the decedent resided together with the children of their previous marriages. Officers of the Scientific Investigation Bureau, headed by Detective Sergeant Moller, arrived at about 12:10 P.M., conducted an investigation of the death scene and removed the pillow, the pillowcase and the top sheet from the decedent's bed. There were no signs of an unlawful entry or a struggle. Detective Moller noticed certain medical items, such as a disposable syringe, a needle, an empty vial and other items, in the wastebasket in the bedroom, but they were not *then* removed.

In the light of a preliminary medical examination at the scene, the medical examiners made a tentative determination of death due to a natural cause, an aneurysm. However, because of the extensive bleeding, the possibility of homicide was not ruled out.

At about 2:40 P.M. the body was removed to the Nassau County Medical Center for an autopsy, the defendant went to his mother's house nearby and the detectives also left the scene. Policemen were posted as guards and were instructed to per-

mit no one to enter the decedent's bedroom, but no restriction was placed upon the use of the rest of the house by the family.

Shortly after 3:00 P.M. that same afternoon the detectives were informed that the autopsy disclosed that a .22 calibre bullet had been found in the decedent's brain and that she was, therefore, a homicide victim. The detectives immediately returned to the decedent's home, arriving at about 3:35 P.M., within an hour after the time the body was removed for the autopsy. During the course of the ensuing search, for "whatever happens to turn up," Sergeant Moller alerted the detective in charge to the contents of the bedroom wastebasket which had been previously observed. They were then seized, along with certain further items of bedding. In addition, certain papers and writings found in a maid's room and a cardboard box found in the attic containing, *inter alia,* a leather holster and ammunition for several different calibre guns (including .38 and .45 calibre cartridges) were seized and photographs were taken of the bedroom.

Sometime after 5:00 P.M. the defendant and his stepson David were brought to police headquarters and questioned. Both voluntarily submitted to paraffin tests of their hands to determine if either or both had recently fired a gun. The paraffin tests as to both were positive. Sometime later in the evening the defendant voluntarily submitted to a neutron activation analysis to determine with greater certainty whether gunshot residue was present on his hands. This test was also performed on the defendant's clothing, but the results of the neutron tests were not available until days later.

Shortly before midnight, four search warrants, which had been obtained earlier in the evening based on affidavits by Detective Wichmann, were delivered to a Detective Karazia for execution. The warrants specified the places to be searched (the defendant's two offices, his mother's home and his automobile) and they specified the object of the search as a "22 Calibre firearm (pistol or rifle)  *  *  *  or evidence or any part thereof."

Wichmann's supporting affidavits alleged that he had earlier been informed by the decedent's son David that when the defendant left his home at about 8:00 A.M. that morning to take the decedent's daughter by a prior marriage to school on his way to his dental office, he was carrying a small bag. The daughter stated that the defendant had never carried the bag before that morning. Sometime after midnight on the morning of May 13, 1971, Detective Karazia executed the warrant pertaining to the

automobile and discovered a small brown leather bag in the trunk. He opened the bag and observed its contents, some 27 items of dental and medical equipment. There was no gun. The bag and its contents were seized nonetheless and eventually all of the items were returned to the defendant, with two exceptions, a hypodermic needle with a blue plastic base found in the bag and the leather bag itself. The automobile was then brought to police headquarters and, subsequently, the steering wheel was subjected to a neutron activation analysis.

The People challenge the suppression by the County Court of (1) the evidence seized from the defendant's house following the 3:35 P.M. return to the premises by the detectives, including photographs of the bedroom taken by the police, and (2) the hypodermic needle, the leather bag in which it was found and the defendant's automobile. The People contend that since policemen had remained on the premises to guard the bedroom, the search conducted after it became known that a homicide had occurred was but a continuation of the initial justified intrusion. Emphasizing that a homicide had occurred (in the estimate of the People an exigent circumstance requiring a comprehensive investigation), the People assert that it would be unreasonable to arbitrarily limit the length of time the police might legally spend at the " crime scene ". With reference to the seizure of the automobile, the hypodermic needle and the leather bag, they argue that since the warrants authorized the seizure of a .22 calibre firearm and " evidence or any part thereof," the meaning of " evidence or any part thereof " must be analyzed in the light of the affidavits upon which the warrants had been obtained and that, so read, the warrants were sufficiently broad to encompass those articles within its scope.

### THE LAW

It is beyond cavil at this point in our constitutional development that the Fourth Amendment does not prohibit all, but only unreasonable, searches and that warrantless searches are per se unreasonable (*Coolidge* v. *New Hampshire*, 403 U. S. 443). However, the initial police intrusion into the defendant's home on the morning of the decedent's death was indisputably valid under a number of rationales: (1) the request of the decedent's 20-year-old son, (2) entry pursuant to the general obligation of policemen to assist people in distress or under exigent circumstances (*People* v. *Gallmon*, 19 N Y 2d 389, 394, cert. den. sub nom. *Gallmon* v. *New York*, 390 U. S. 911; *Coolidge* v. *New Hampshire, supra*; *Beedenbender* v. *Midtown Props.*, 4 A D 2d

276, 281) and (3) entry pursuant to valid statutory authority (Nassau County Govt. Law, § 2101; L. 1936, ch. 879, as amd.).

Given the propriety of the original police entry into the defendant's house, and that is not disputed, we are of the opinion that the subsequent searches which uncovered evidence not only in the bedroom, the immediate scene of the crime, but in the maid's room and the attic as well, were proper and that the evidence thus discovered should not be suppressed.

Although the initial police intrusion was for the purpose of investigating the scene and the cause of a death, the subsequent search, once criminality had been established, was but an extension or continuation of the initial investigation.[1] In view of the broad and indisputably necessary and proper authority granted to a medical examiner to "fully investigate the facts concerning the circumstances of * * * [a] death" (Nassau County Govt. Law, § 2101, subd. 2), the line drawn by the County Court in scale or scope between the initial investigation of the decedent's death and the subsequent search of the premises was, in our opinion, based upon a distinction without a difference. Clearly there had been a violent death and it was logical to assume that a crime had been committed and that evidence of that crime might still be on the premises.

The posting of a police guard at the bedroom door served not only to prevent the destruction or removal of any potential evidence but also to establish a continued and legally proper police presence on the scene. The fact that the detectives involved in the initial investigation left the house at about 2:40 P.M., when the body was removed for the purposes of autopsy, did not in any way signify that the investigation had been completed or that the police had quit the scene. It was clear to the police at the time the body was removed that the diagnosis of the cause of death was merely tentative and, in the light of the excessive

---

1. In coming to a contrary conclusion the learned County Court Judge said (*People* v. *Neulist*, 72 Misc 2d 140, 154–155, *supra*) : " The illegality of this seizure is pointed out in *Dombrowski* v. *Cady* (11 C.L.R. 2289, 2290, *supra*), in the following language: 'The plain view doctrine applies only where the discovery was " advertent. * * * But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different." Coolidge at 469–470.' " He then continued: " For the reasons hereinabove set forth, the articles taken by the police as a result of their search of the Neulist premises during their second entry after the cause of death had been determined, must, and are hereby suppressed from use as evidence upon the trial herein." However, *Dombrowski* v. *Cady* (471 F. 2d 280) was reversed by the Supreme Court of the United States (413 U. S. 433), after the determination in the instant case by the County Court.

blood loss suffered by the decedent, that foul play was a distinct possibility. It is clear that had the decedent's bullet wound been discovered before the body was removed from the house, a complete and comprehensive search of the premises would have then been conducted in accordance with standard police procedure. We discern no viable legal reason to draw a distinction between such a situation and what actually occurred in the present case. Common sense calls for the same result in both cases. While some of the police personnel had temporarily left the premises, they returned within an hour's time to resume their investigation. Granted the detectives were then proceeding on confirmed information rather than on doubt or suspicion as to the cause of death, and granted further that had the death not been determined to have been caused by criminal means, the detectives would likely not have returned to the crime scene, nevertheless, these factors do not change the essential validity of the continued police search in this case. The crucial elements are the posting of the guard, thereby establishing a continuing police presence on the scene, and the relatively brief lapse of time between the removal of the body and the continuation of the investigation. These elements serve to distinguish the present case from a case like *State* v. *Davidson* (44 Wis. 2d 177). In *Davidson,* the police were summoned to the house of the deceased by a neighbor. The body was found in the basement in circumstances clearly indicative of homicide. Warrantless searches of the house were undertaken that day *and three days later.* The Wisconsin court invalidated the subsequent warrantless search and condemned the police " re-entry " without a compelling reason for failing to obtain a warrant. In the case at bar, there was no " re-entry ", because of the continued police presence on the scene even after the body was removed.[2] Nor had the police assumed the status

2. See *People* v. *Williams* (67 Cal. 2d 226, 231), in which the court held that a search once lawfully begun may be interrupted and later continued if the " totality of circumstances " under such continued search is reasonable. In *State* v. *Chapman* (250 A. 2d 203 [Me.]) the facts were strikingly similar to those in this case and, while the court there, in coming to the conclusion which we have here reached, relied in part upon *United States* v. *Rabinowitz* (339 U. S. 56), which has since been overruled by *Chimel* v. *California* (395 U. S. 752), its reasoning is nonetheless persuasive. The court there said (p. 210): "With these several guidelines in mind, we turn to an analysis of the facts to determine whether or not the 'totality of circumstances' rendered reasonable and therefore constitutionally lawful the warrantless search and seizure in this case. We begin with the consensual entry of Officer Fortier upon the premises which the defendant readily concedes was lawful. Once there, he was faced at once with an emergency. Mrs. Chapman was dead. The severe wound upon her

of trespassers by virtue of the posting of guards (cf. *People* v. *Perez*, 35 Misc 2d 461; *People* v. *Brown*, 40 A D 2d 527). Also distinguishable from the case at bar is the line of cases involving what is known as a "delayed search" (*Preston* v. *United States*, 376 U. S. 364; *People* v. *Brosnan*, 32 N Y 2d 254, 260–261; *People* v. *Lewis*, 26 N Y 2d 547).

Additionally, in dealing with a homicide the police should be accorded greater leeway both in terms of the element of time and in the permissible scope of their investigation. In the context of this case, the police were not limited to an examination and search of the immediate area where the body was found (i.e., the bedroom). On the contrary, they had the right, indeed the duty, to examine the "crime scene", which should be deemed to include the entire house. There was here no more than the "legitimate and restrained investigative conduct undertaken on the basis of ample factual justification" (*Terry* v. *Ohio*, 392 U. S. 1, 15). Therefore, that branch of the order of the County Court which suppressed the items taken by the police after their return to the premises should be reversed and the defendant's motion in that respect denied.

We come now to the suppression of the brown leather bag, the hypodermic needle found therein and the steering wheel of the defendant's automobile. The search warrant for the auto-

---

body and the presence of quantities of blood not only in the vicinity of the body, but in several rooms, were strongly suggestive of the possibility of violent death or homicide. At that moment the duty and obligation of the police arose to make a thorough investigation to determine whether the decedent was the victim of foul play and if so by whom and by what means. Officer Fortier initiated proper police investigative procedures by telephoning for assistance. In response to his call those officials directly charged with the investigation of a potential homicide case gathered at the scene. The circumstances there present created a difficult and somewhat unusual problem for solution by further investigation. The police could not immediately rule out the possibility that death had resulted from a fall as voluntarily and spontaneously represented to them by the defendant. Such a fall could have occurred as the result of a cerebral accident, an acute heart failure or other seizure, or even as the result of the consumption of alcohol. Or it could have occurred as the result of a tragic accident. There were indications, however, pointing with equal if not greater persuasiveness toward the application of violent force by some assailant as the cause of death. The logical next step in the investigation was to secure and observe an autopsy which might eliminate (as it did) at least some of the alternative possibilities. Recognizing that the investigation of the scene was by no means completed, the police carefully maintained their exclusive control of the premises, thus insuring the exclusion of unauthorized persons and the protection and preservation of any evidence thereon. Thus when the examination of the premises was resumed, it was but the continuation of a single investigation, a 'continuing series of events,' commenced with a lawful entry and pursued because of the exigency of circumstances."

mobile reads: "YOU ARE THEREFORE COMMANDED (at any time of the day of night) between May 12, 1971 and May 13, 1971, to make an immediate search of 1970 Chevrolet Convertible Red Reg. #6879 OL 1971 New York, located at 17 Macky Avenue, Port Washington for 22 Calibre firearm (pistol or rifle) and if you find such property or evidence or any part thereof, to bring it before me in the County Court, County of Nassau Mineola, New York."

On the basis of cases like *People* v. *Baker* (23 N Y 2d 307) and *Marron* v. *United States* (275 U. S. 192), the seizure of the bag and its contents, as well as the steering wheel, would appear to be unauthorized. In *Baker* the court said (pp. 319–321):

"We come then to the question whether the seizure of certain evidence admitted at the trial violated the Fourth Amendment to the Constitution and should not have been received. It will be recalled that Barnes, in his account of the crime to the police, related that Rice had given a demonstration of the 'dousing' with a bloodstained knife. At the shop, the police had found one knife and based on Barnes' account a warrant to search Rice's home for the second knife was procured. A detective went to execute the warrant. He was admitted to the apartment by Rice's grandmother. In Rice's bedroom he did not find the knife, but he did notice a beige cardigan sweater or jacket with knit sleeves and a suede front. The detective remembered that Mr. Sugar had mentioned that the boy who had attacked him had worn such a sweater. The sweater was seized and, upon Mr. Sugar's testimony that it was the sweater worn by his attacker, it was received in evidence, but solely against Rice.

"It is argued that the sweater was not described in the warrant and its seizure was unauthorized. In our judgment this contention is correct.

"In *Marron* v. *United States* (275 U. S. 192) the police had obtained a warrant for liquor but, during the course of their search, they discovered books and records concerning the operation of an illegal liquor enterprise. In holding the seizure illegal, the Supreme Court said (275 U. S., p. 196): 'The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' * * *

"Here, however, the authorization for the intrusion was very narrow and circumspect—for a weapon used during the commission of a crime—and there were no exigent circumstances requiring an immediate response. To permit the seizure of unauthorized items in the course of a lawful search would eliminate the constitutional requirement of 'particularity' and would open the door for general searches abhorred since colonial days and banned by both the Federal and State Constitutions. The right to search for and seize one item does not permit the inference that there is probable cause for other items."

However, we are constrained to the view that the line of cases exemplified by *Baker* and *Marron* have been overruled — at least in automobile cases—*sub silencio* by the Supreme Court of the United States in *Cady* v. *Dombrowski* (413 U. S. 433, revg. 471 F. 2d 280, *supra*).

In that case two automobiles were involved—a Thunderbird and a Dodge. The Thunderbird was searched without a warrant, but, although the majority of the Supreme Court upheld that search, we are not here concerned with that phase of the case. The Dodge was searched pursuant to a warrant which authorized the seizure of a bloody seat and a briefcase. When the police executed the search warrant they not only seized the bloody seat and the briefcase, but also a sock and a floormat in the automobile.

In the majority opinion reversing the Court of Appeals (7th Cir.), which had not only suppressed the items found in the Thunderbird but also the sock and the floormat found in the Dodge, Mr. Justice REHNQUIST said (p. 448): "The Wisconsin Supreme Court ruled that the sock and the portion of the floor mat were validly seized from the 1960 Dodge. The Fond du Lac county officer who looked through the window of the Dodge after McKinney's body had been found saw the bloody seat and briefcase, *but not the sock or floor mat. Consequently, these two items were not listed in the application for the warrant*, but the Dodge was the item 'particularly described' to be searched in the warrant. *The warrant was validly issued and the police were authorized to search the car.* The reasoning of the Wisconsin Supreme Court was that although these items were not listed to be seized in the warrant, the warrant was valid and in executing it the officers discovered the sock and mat in plain view and therefore could constitutionally seize them without a warrant" (emphasis supplied). Upholding that reasoning, the Supreme Court concluded that "these items were constitutionally seized" (p. 449).

The four-man minority opinion apparently did not disagree with the majority of the Supreme Court on this phase of the case, but believed that the case should be remanded to the District Court "for determination whether the evidence seized during the search of the Dodge and the farm were the fruit of the unlawful search of the Thunderbird" (p. 454). Thus, all of the members of the court were apparently in agreement that despite the fact that the application for the warrant and the warrant itself authorizing a search of the Dodge car had referred only to the bloody seat and the briefcase, the seizure of the other items (the sock and the mat) was constitutionally warranted, because they were in open view in a place where the searcher had a right to be. That fact pattern is duplicated here for here, too, the warrant authorized a search of a specific automobile and therefore the police had a right to seize anything in that automobile.

In the present case, we have thus far not referred to the fact that apparently (although the record is not exactly clear on the subject) the keys to the automobile were voluntarily given to the police by the defendant. Under such circumstances, the search of the car may be deemed to have been undertaken with the consent of the defendant, without regard to the claimed limited scope of the search warrant.

Under all of the circumstances, the order appealed from should be reversed insofar as appealed from, on the law and the facts, and the motion to suppress should be denied in its entirety.

HOPKINS, Acting P. J., MUNDER, LATHAM and BRENNAN, JJ., concur.

Order reversed insofar as appealed from, on the law and the facts, and defendant's motion denied in its entirety.