UNITED STATES, Appellant

v

JOHN P. SMEAL, Sergeant, U. S. Air Force, Appellee

No. 28,788

March 14, 1975

*Captain Frederick P. Waite* argued the cause for Appellant, United States. With him on the brief was *Colonel C. F. Bennett.*

*Captain Byron D. Baur* argued the cause for Appellee, Accused. With him on the brief was *Colonel William E. Cordingly.*

## OPINION OF THE COURT

COOK, Judge:

As the result of a telephone call to the effect that accused's wife had apparently shot herself, agents of three law enforcement groups went to the accused's quarters at Edwards Air Force Base, California. What transpired thereafter led to the accused's conviction for the theft of a government-owned typewriter. For different reasons, a majority of the U. S. Air Force Court of Military Review concluded, on review of the conviction, that the typewriter had been obtained by means of an illegal search. The court reversed the findings of guilty and dismissed the charge because of the apparent unavailability of other admissible evidence of guilt. Proceeding under Article 67(b)(2) of the Uniform Code of Military Justice, 10 USC § 867, the Judge Advocate General of the Air Force has forwarded the record to this Court for consideration of the following question:

WAS THE COURT OF MILITARY REVIEW CORRECT IN ITS HOLDING THAT THE DISCOVERY OF THE TYPEWRITER WAS THE RESULT OF AN UNLAWFUL SEARCH?

Notified by telephone that Mrs. Smeal had apparently shot herself,[1] the base security police dispatched three security policemen, from different places on the base, to the accused's home. Sergeant Small, who was on patrol, arrived first. He saw the accused and a neighbor outside the house. Responding to Small's question, "Where is she?" the accused led the way into the house and to the bathroom. When Small saw Mrs. Smeal on the bathroom floor, his immediate reaction was to run back to his vehicle to inquire by radio about an ambulance; he was advised that one was en route. Sergeant Grabowski then arrived. He estimated his time of arrival as between 7:00 and 7:30 p.m. An ambulance came within moments, and Mrs. Smeal was removed to the hospital. Small and the accused also left for the hospital in Small's vehicle. Grabowski remained. He telephoned the desk sergeant at the security police office to report the matter as a serious incident which required notification of the Office of Special Investigations. In accordance with "proper procedure" and while awaiting the arrival of "other personnel," he busied himself "securing the crime scene" by checking all windows and doors.[2] Grabowski was out of the house interviewing a neighbor

---

[1] Mrs. Smeal died shortly thereafter at the base hospital.

[2] Two other security policemen arrived during this interval. One testified he also acted to protect the scene, pending the arrival of OSI agents, but what he did is not material to the certified question.

when the third security policeman who had been directed to the house, Sergeant Carpenter, arrived.[3]

Carpenter testified that Small, who had returned from the hospital, briefed him as to what had been done. "About this time the OSI Agents, Mr. Chambers and Mr. Hove arrived . . . ." In turn, Carpenter briefed them. Chambers went to the hospital to talk to the accused. At Carpenter's direction, Small telephoned the Kern County sheriff's office to report the incident, as that office had jurisdiction in matters involving civilians on the base.

Deputy Sheriff McCollum arrived at the house between 8:00 and 8:30 p.m. (15 or 20 minutes after 8:00). He found the security policemen and OSI agents "just standing around." He took charge and "attempted to determine what had taken place." He inspected the bathroom where Mrs. Smeal's body had been found, and observed a large pool of blood, a beer can, and a .22-caliber revolver on the floor; there was also blood in the bathtub. Informed that blood had been found on two telephones in the house, one in the kitchen and the other "on the phone in the bedroom," he went into the bedroom. On the floor of that room were other spots "that appeared to be blood that had been wiped up." Confronted with this evidence, he proceeded on the assumption that the shooting might have "been done by somebody other than the victim." He asked the other agents to search for a rag or other article that could have been used to wipe up the spots. McCollum described the ensuing search as quite thorough.[4]

Hearing about the spots that had been wiped up, Carpenter went into the bedroom to look at them. He kneeled on the floor to inspect one area; as he looked up, he "looked directly into the [open] closet and I saw the silhouette of the typewriter."[5] He was about 3 or 4 feet from it and could readily distinguish its color, that it was an office-type electric machine, and that it bore an IBM emblem. These characteristics "fit the description" of typewriters he knew had been reported stolen from an office on the base. Accordingly, he went over to it and "looked for a serial number." He apparently moved the machine around on the basket on which it rested and also apparently moved the carriage to expose the serial number.

On returning to the living room, Carpenter told Agent Hove about the typewriter. Hove also went into the bedroom to look at the typewriter and make a note of the machine's serial number. The search for further evidence relating to the shooting continued. Eventually, the house was secured and all the investigators left. The OSI agents returned to

---

[3] Carpenter testified that he arrived between 6:30 and 7:00 p.m. That time does not agree with Grabowski's estimate as to his time of arrival. However, only their actions, not the sequence of arrival, is important to the certified question.

[4] The search uncovered a number of articles, other than the typewriter, which were also believed to be the property of the United States Government. The accused was charged with larceny of these articles, but for an unspecified reason, the trial judge sustained a defense objection to the admission in evidence of all these items. As a result, the court granted a motion for a finding of not guilty of the charges relating to the excluded articles.

[5] Called as a defense witness, Sergeant Grabowski testified that when he went through the house to check the windows and doors, he did not "notice any closets being open," but he admitted he "paid no particular attention to the closets at all," as he was only looking for "any way a person could gain entry into the house." Before ruling on the defense objection to the admission into evidence of the typewriter, the trial judge heard a play back of the tape of Carpenter's testimony. In light of the judge's suppression of all other articles uncovered in the course of the search, his overruling of the objection to admission of the typewriter implies a finding that the closet door was open. That finding was not overturned by the Court of Military Review, although one member of the majority suggested that one might "speculate whether the closet doors were open." As the totality of the evidence supports the finding, we accept it as an operative fact bearing upon the issue before us. United States v Phifer, 18 USCMA 508, 40 CMR 220 (1969).

their office and checked the serial number of the typewriter against their records and found it matched that of a stolen machine. The next morning, Agent Chambers informed the base commander of these facts and obtained authorization from him to search the accused's house. Pursuant to receipt of such authorization, the typewriter and other articles were seized. *See* note 4, *supra.*

The core of the Fourth Amendment right is security of the individual's privacy against arbitrary intrusion by Government agents. *Coolidge v New Hampshire,* 403 US 443, 455 (1971); and *Wolf v Colorado,* 338 US 25, 27 (1949). It has often been said that police entry into a private dwelling without a warrant is per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions. *Katz v United States,* 389 US 347, 357 (1967); *see also Cady v Dombrowski,* 413 US 433 (1973). Yet a canvass of the vast literature of judicial opinions and scholarly texts on the subject leaves the distinct impression that the apparent exceptions are increasing, and the contours of the "established" exceptions are more amorphous than absolute. Moreover, a warrant authorizing police intrusion into private premises does not guarantee the constitutionality of the entry or relieve the Government of the burden of establishing that the warrant did not authorize an unreasonable search. Consequently, it might be more conducive to rational analysis of the legitimacy of Government intrusion to put aside characterization as per se legal or illegal, which is and can be no more than tentative, and start not with a label, but with a statement of the constitutional requirement that a Government intrusion must be reasonable, and the burden of proof thereof is on the Government. *See United States v Kazmierczak,* 16 USCMA 594, 600, 37 CMR 214, 220 (1967). As much as the matter invites analysis, however, we need not go beyond the formulation of the per se

unreasonableness of a warrantless search that is the beginning point of appellate defense counsel's argument. So long as the United States Supreme Court perceives the concept as an essential ingredient of the constitutional right against unreasonable search and seizure, we are bound to accept it. *United States v Whisenhant,* 17 USCMA 117, 121, 37 CMR 381, 385 (1967).

Appellate defense counsel concede that the security police could, as an exception to the per se rule of unreasonableness, properly respond to the bona fide emergency and enter the accused's home without a warrant. However, they contend the emergency presented by the report of the shooting ended when Mrs. Smeal was removed from the house and taken to the hospital.[6] One judge of the two-judge majority in the court below followed the same reasoning to conclude that with the end of the emergency, the law enforcement agents could not remain in and search the accused's house for anything. Support for this position is largely predicated upon *Root v Gauper,* 438 F2d 361 (8th Cir. 1971).

In the *Root* case, a husband was shot by his wife. He called the telephone operator to request an ambulance, indicating he had been shot by his wife. The operator connected him with Collier, an ambulance driver, who telephoned the town marshal; and the marshal called the county sheriff. The ambulance driver and his assistants arrived at the house before the police. They found the victim unconscious and removed him to the hospital. Some minutes later, the town marshal and then the sheriff reached the house. They went inside. There they found a shotgun and some shells and also took some camera shots of the interior. When they left, they took the shotgun and shells with them. At accused's later trial for the involuntary manslaughter of her husband, the trial court, over defense counsel's objection, admitted the shotgun into evidence. In a subsequent habeas corpus proceeding, the Court of Appeals affirmed a trial ruling

---

[6] The concession actually goes further in that appellate defense counsel construe the accused's conduct, in response to Sergeant Small's question, as leaving

"no doubt that he consented to entry into his home, at least for the purpose of . . . probably getting her transported to a medical facility."

that the officers' entry into and inspection of the house constituted an illegal search and seizure because the emergency which brought them to the house had ended. In our opinion, the court took too restrictive a view of the nature of the situation confronting the law enforcement officers. In any event, *Root* is significantly different from the present case in that here the officers were properly in the house before Mrs. Smeal was taken to the hospital.

Mrs. Smeal had been shot. Sergeant Small did not describe her condition when he saw her in the bathroom, but his instantaneous response plainly indicates she was unconscious and in obvious need of immediate medical attention. Although the wound had been reported as apparently self-inflicted, there were indications, as Agent Chambers testified, that a criminal "homicide had occurred." Among other things, there was "the position of the gun on the floor." In substantially similar circumstances, a New York appellate court rejected the idea that police officers properly on the scene are constitutionally obligated to leave immediately upon removal of the decedent's body from the premises. *People v Neulist,* 43 App Div 2d 150, 350 NYS2d 178, 181 (1973).

In *Neulist,* the police and medical examiners, responding to a telephone call from the defendant's son, appeared at the accused's house. They found the dead body of defendant's wife on a bed in a pool of blood. There were no visible signs of a struggle and no evidence of forcible entry. The medical examiners made a "preliminary" examination and tentatively concluded the decedent had died from an aneurysm, a natural cause. However, because of the amount of blood present, they did not rule out the "possibility" of a criminal cause. There, as here, the body was removed; a guard was posted at the bedroom door to prevent entry into it. The defendant, who had been present during this interval, also left the house. Within the hour, detectives returned. They had been informed that an autopsy had disclosed a .22-caliber bullet in the decedent's brain. The police searched the house and seized certain items of evidence, which led to a charge of murder against the defendant.

Before trial, the defendant moved to suppress the evidence. The judge granted the motion, but his ruling was reversed by the appellate court. In material part, the court said:[7]

Given the propriety of the original police entry into the defendant's house, and that is not disputed, we are of the opinion that the subsequent searches which uncovered evidence not only in the bedroom, the immediate scene of the crime, but in the maid's room and the attic as well, were proper and that the evidence thus discovered should not be suppressed.

Although the initial police intrusion was for the purpose of investigating the scene and the cause of a death, the subsequent search, once criminality had been established, was but an extension or continuation of the initial investigation . . . . Clearly there had been a violent death and it was logical to assume that a crime had been committed and that evidence of that crime might still be on the premises.

The posting of a police guard at the bedroom door served not only to prevent the destruction or removal of any potential evidence but also to establish a continued and legally proper police presence on the scene. The fact that the detectives involved in the initial investigation left the house at about 2:40 P.M., when the body was removed for the purposes of autopsy, did not in any way signify that the investigation had been completed or that the police had quit the scene. It was clear to the police at the time the body was removed that the diagnosis of the cause of death was merely tentative and, in the light of the excessive blood loss suffered by the decedent, that foul play was a distinct possibility. It is clear that had the decedent's bullet wound been discovered before the body was removed from the house, a complete and comprehensive search of the premises would have then been conducted in accordance with standard police procedure. We discern no viable

---

[7] 350 NYS2d at 183–185 (citations omitted).

legal reason to draw a distinction between such a situation and what actually occurred in the present case. Common sense calls for the same result in both cases. While some of the police personnel had temporarily left the premises, they returned within an hour's time to resume their investigation. Granted the detectives were then proceeding on confirmed information rather than on doubt or suspicion as to the cause of death, and granted further that had the death not been determined to have been caused by criminal means, the detectives would likely not have returned to the crime scene, nevertheless, these factors do not change the essential validity of the continued police search in this case. The crucial elements are the posting of the guard, thereby establishing a continuing police presence on the scene, and the relatively brief lapse of time between the removal of the body and the continuation of the investigation. . . . In the case at bar, there was no "re-entry", because of the continued police presence on the scene even after the body was removed. Nor had the police assumed the status of trespassers by virtue of the posting of guards.

> . . . On the contrary, they had the right, indeed the duty, to examine the "crime scene", which should be deemed to include the entire house. There was here no more than the "legitimate and restrained investigative conduct undertaken on the basis of ample factual justification". (Terry v Ohio, 392 US 1, 15, 88 S Ct 1868, 1876, 20 L Ed 2d 889).

In our opinion, *Neulist* correctly emphasizes that although a defendant may have a right of possession or control over the premises entered by the police, their entry in a situation like that present here is not predicated upon his consent, but upon the independent right of the individual whose condition generates the emergency to which they have responded. The same concept appears in *United States v Barone*, 330 F2d 543 (2d Cir 1964), *cert denied*, 377 US 1004 (1964), which is perhaps the most frequently cited case on the subject. There,

police officers heard screams from a rooming house. They entered the building and knocked on the door of the only apartment that appeared to be occupied. After some delay, the door was opened and they were admitted. Two women were present and each denied knowledge of hearing any screams; one suggested, in possible explanation, that she might have had a nightmare. These disclaimers of a cry for help did not terminate the right of the police to remain and to investigate. On the contrary, the court approved of the entry of one of the policemen into a bathroom when he was alerted to the existence of the room by the sound of a flushed toilet and the emergence of a man. On entry into the bathroom, the officer saw pieces of currency floating in the commode. He retrieved them and saw they were counterfeit money. As a result, the man was arrested for possessing counterfeit money and was, in due course, brought to trial. In sustaining the right of the police to enter the bathroom, the Court of Appeals said:[8]

> Having found nothing amiss in the main room of the apartment, it was the duty of the police to enter the bathroom and complete their view of the premises. They knew that a man must be in the bathroom as they had been answered by a male voice when they sought admission. Their investigation of the cause of the screaming would have been incomplete without finding out who might be in the bathroom and whether anyone there might be in need of aid. The fact that the appellant had just left the bathroom as they were on the point of entering did not render it unnecessary for them to view the bathroom. At this point the sound of the water directed Patrolman Cottle's attention to the commode where paper money was floating in plain view. As it is unusual for anyone to flush away good paper money, it was in the line of the officer's duty to take the money from the commode to ascertain its nature. His presence at the place was lawful. The performance

---

[8] *Id.* at 545.

of his duty required him to act as he did.

■ Here, Sergeants Small and Grabowski were properly on the premises. That much is conceded by the accused. We do not believe that the accused had constitutional protection against the adverse consequences of their presence. As in *Barone, supra,* they were not bound to accept the apparently innocent explanation of the victim's injury[9] and close their eyes to evidence that indicated Mrs. Smeal might have been the victim of a crime and forthwith cease all inquiry into the matter. It would, in our opinion, beggar law and logic to hold, as the accused argues, that police officers, properly on premises to investigate an injury to a person who has a right of possession or control over those premises, must remove themselves from the scene as soon as the individual is taken therefrom for medical or other reasons.

From what he observed, Grabowski immediately recognized that the matter was outside his authority and competence; consequently, he reported it as a serious incident requiring the attention of the OSI; and later, for the same reason, Carpenter arranged for notification of the county sheriff's office, which had "jurisdiction." A rule of police practice may not, of course, justify the violation of the constitutional right of an individual, but it may properly be considered in determining whether, in a particular instance, the police acted arbitrarily and unreasonably in what they did. *United States v Edwards,* 415 US 800 (1974).

■ A spouse can voluntarily admit the police into the marital home and to parts thereof not exclusively reserved to the other. *United States v Matlock,* 415 US 164 (1974); *United States v Thompson,* 421 F2d 373 (5th Cir 1970). Mrs. Smeal did not herself call the police, but, as we have already indicated, even the accused concedes that the security police could lawfully enter the house in her behalf. The circumstances indicated that she may have been the victim of a crime.

_____

[9] We need not consider whether attempted suicide is a crime under California law.

As *Neulist* and *Barone* indicate, the police were duty bound to investigate the circumstances without regard to the wishes of the accused. We are satisfied, therefore, that there was no arbitrary intrusion by either the OSI agents or Deputy Sheriff McCollum when they responded to the respective calls for assistance, notwithstanding Mrs. Smeal had been removed from the house to the hospital. Although Sheriff McCollum arrived at the house between 45 to 75 minutes after he was called, in our opinion his entry was as fully justified as that of the security police.

As a fallback position, appellate defense counsel contend that the scope of the investigation that was conducted by the officers was "unwarranted by the circumstances." Strong reliance is placed on *United States v Goldenstein,* 456 F2d 1006 (8th Cir 1972). In that case, the police were called to a hotel to investigate a shooting in the lobby. On arrival, they found the victim dead. Informed by the desk clerk that Goldenstein had registered at the same time as the victim; that just after the shooting he had been seen with a gun and appeared to be wounded; and that he had gone upstairs, the officers went to Goldenstein's room. Their knock at the door received no answer. At their request, the hotel clerk opened the door. The trial judge ruled, and the Court of Appeals agreed, that the officers "were justified in entering the defendant's room" to interrogate him. However, a majority of the court concluded that when Goldenstein was not found in the room, the officers could not then search the room as they did. As a result, it held inadmissible evidence to the effect that a closed suitcase had been found on a dresser; the suitcase was opened and inside was a large amount of currency, including 50 twenty-dollar bills recognized as "bait money" taken in a recent bank robbery.

The court gave two reasons for its decision. First, it hypothesized that the right to search in Goldenstein's absence could be "no greater than the right to search incident to a lawful arrest." *United States v Goldenstein, supra* at 1010. It perceived an arrest as justifying only "a search for weapons or evidence

which defendant might immediately destroy." *Id.* Since Goldenstein was not present, there was no need to search for a weapon and no danger of destruction of evidence. The logical result for the court was that the closed suitcase could not be opened. Assuming, without deciding, the correctness of the court's premise that the scope of the search of Goldenstein's room could not exceed the scope of a search incident to a lawful arrest, two recent decisions by the United States Supreme Court, *United States v Robinson,* 414 US 218 (1973), and *Gustafson v Florida,* 414 US 260 (1973), demonstrate that the scope of the latter in regard to search of the person and the area within his reach, is greater than it was perceived by the Court of Appeals.

The second reason given by the Court of Appeals to invalidate the search is more to the point of this case. The court reasoned that "the Government has failed to establish that . . . [the police] at the time of the search had knowledge or reliable information that Goldenstein had shot anyone or that he had committed any crime." *United States v Goldenstein, supra* at 1010. The dissenting judge challenged that assessment of the evidence, but acceptance of it does not aid the accused.

■ ■ In *Goldenstein,* the police entered premises that were not the situs of the event that brought them to the scene. In this case, the officers were at the very scene of the incident. We have already indicated they had articulable reason to believe that Mrs. Smeal may not have attempted suicide, but was the victim of a criminal assault; consequently, they were not bound to treat the shooting as an innocent act, but could investigate it as a crime against her in her own home. *United States v Barone, supra; People v Neulist, supra.* In *United States v Birrell,* 470 F2d 113 (2d Cir 1972), the police were summoned to the apartment of a woman who had been shot to death. After the body had been removed, the police searched the apartment and took possession of property that apparently belonged to the victim. The Court of Appeals observed that it would be the "sheerest formalism" to insist that only a warrant could justify the search and seizure. In our opinion, therefore, the officers acted reasonably in examining the bedroom to ascertain the nature of the shooting. And the stain on the floor that appeared to be a blood spot that had been wiped up was an appropriate subject of scrutiny. We conclude, therefore, that although Sergeant Carpenter had been in the bedroom previously and had seen nothing incriminating, he was justified in returning to the room to examine the spot. In the course of a valid investigation, a temporary and incomplete inspection of a part of the premises does not bar a return to that part for a more detailed examination. As was noted in the principal opinion in *United States v Gebhart,* 10 USCMA 606, 610, 28 CMR 172, 176 (1959), "the authority to search may include a return visit to the premises."[10] *See also United States v White,* 17 USCMA 211, 217, 218, 38 CMR 9, 15, 16 (1967).

---

[10] State v Pires, 55 Wis 2d 597, 201 NW2d 153 (1972), presented a situation substantially similar to that present in this case. There, the defendant's husband returned home and found the defendant semiconscious on a bed in the bedroom; also on the bed was the apparently dead body of his infant child. He testified that he called for a police ambulance. After the defendant, her husband, and their child's body had been removed, several police officers arrived, entered the house and searched it, including the bedroom. The court held this was lawful. However, by a closely divided vote, the court held a second entry into the bed-room to be illegal. This entry came about when a detective arrived and, on learning from the other officers present what had transpired, entered the bedroom; on this occasion, they found a clipboard with a pad of paper with writing on it. The writing consisted of inculpatory statements by the wife. The dissent could not, as the majority had, accept the conclusion that "two police visits to the bedroom, separated by minutes . . . [were] two separate searches." The dissent reasoned that if the police "had the right to check the bedroom . . . they had the right . . . to recheck it." *Id.* at 161. As the text indicates, our decision accords with this view.

According to Sergeant Carpenter, he saw the IBM typewriter in the open closet of the bedroom as he "looked up [from the spot] . . . directly into the closet." The size, color, and make of the machine corresponded to those characteristics of a typewriter reportedly stolen from an office on the base. Appellate defense counsel argue that agreement of the characteristics noted was insufficient to link the typewriter to any criminal act; thus, Carpenter could not lawfully intrude into the closet to copy the serial number. For the most part, the argument rests upon *United States v Gray*, 484 F2d 352 (6th Cir 1973).

In *Gray*, Kentucky State Trooper Brodt received information that defendant was selling beer without a license in his grocery store in a rural area. In plainclothes, Brodt entered the store and purchased five cans of beer. He then obtained a warrant for defendant's arrest and search of the premises. The defendant was arrested and a small quantity of beer was discovered in a cooler in the store. Trooper Brodt continued the search for beer on an upper level of the building. While so engaged, he noticed two rifles in a closet. He removed them to note the serial number on each. Later, a check of the numbers with the National Crime Information Center indicated that the rifles had been stolen in Tennessee during the previous month. A warrant was obtained to search for and seize the rifles, and it was successfully executed. Charged with violation of the federal firearms law, the defendant challenged the legality of Trooper Brodt's action in taking note of the serial numbers of the rifles. The court held Trooper Brodt was justified in his initial search, but that he violated the defendant's right to be free from unreasonable search and seizure when he copied the serial numbers. In part, the court said:[11]

> In the context of a search pursuant to a warrant, the doctrine is a recognition of the fact that when the police come across immediately recognizable incriminating evidence not named in the warrant they should not be required to close their eyes to it, regard-

less of whether it is evidence of the crime they are investigating or evidence of some other crime. The doctrine is also a recognition of the fact that it would be a needless inconvenience to require the police to obtain another warrant. However, it must be "immediately apparent" to the police that the object is in fact incriminating or the seizure of the object would be without probable cause and would turn the search into a general or exploratory one. . . . This is precisely what occurred in this case since the rifles obviously were not receptacles of alcoholic beverages nor were they contraband and the officers' original observation of the weapons was nothing more than a general rummaging. Since the rifles were not incriminating evidence at the time Trooper Brodt removed them from the closet and copied down the serial numbers, this police action cannot be sanctioned under the plain view doctrine. [Citation omitted.]

■ Rather than condemn Sergeant Carpenter's action, *Gray,* in our opinion, sustains the legality of what he did. Unlike Trooper Brodt, Carpenter had a specific and articulable reason to believe that the typewriter in the accused's closet was connected with criminal behavior. Correspondence of manufacturer's model and style between a stolen article and a suspect article provides probable cause to believe that the two are the same. *United States v Barnard*, 23 USCMA 298, 49 CMR 547 (1975). On the basis of similar evidence of identification, civilian courts have also upheld further investigation of a suspect item by police officers properly on the scene of a crime.

In *People v Hill*, 528 P2d 1, 117 Cal Rptr 393 (1974), the police went to a residence to execute a search warrant for evidence related to a shooting and for memoranda concerning narcotics dealings by a person implicated in the shooting. In the course of the search, the police seized a suitcase and a rifle. The court noted that the suitcase "resembled" one used earlier by the individual

---

[11] *Id.* at 356.

specified in the warrant. On that basis, it upheld the right of the police to open the suitcase and, upon seeing that it contained marihuana, to seize it and the contents. As to the rifle, the court noted that the weapon had no connection with the offenses for which the warrant had been obtained but sustained its seizure on the grounds that the "serial number had been removed" and its possession was a misdemeanor under California law. *Id.* at 25. The court's opinion does not describe the circumstances under which the officer determined that the serial number had been removed, but it may fairly be inferred that the officer had to handle the rifle in some way before he could observe the erasure. In *United States v Johnson,* 413 F2d 1396 (5th Cir 1969), the court held that identity of make and color of an auto stopped by the police and one known to have been stolen justified a police check of the serial number of the vehicle to more closely identify the suspect automobile. The necessity for immediate action by the police that arises from the mobility of a motor vehicle has, correctly we think, been applied to readily movable articles. *People v McKinnon,* 7 Cal 3d 899, 500 P2d 1097, 103 Cal Rptr 897 (1972). We are satisfied, therefore, that Sergeant Carpenter acted reasonably and in the least intrusive manner, when he obtained the serial number from the typewriter by moving its carriage while it remained in the closet. It follows that the Court of Military Review erred in its determination that Sergeant Carpenter violated the accused's right to be free from unreasonable search and seizure.

We answer the certified question in the negative and reverse the decision of the Court of Military Review. The record of trial is returned to the Judge Advocate General for resubmission to the court for further proceedings consistent with this opinion.

Senior Judge FERGUSON concurs.

Judge QUINN did not participate in the decision of this case.