THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v
PATRICIA COHEN, Respondent.

Second Department, April 26, 1982

#### APPEARANCES OF COUNSEL

*Carl A. Vergari, District Attorney* (*Anthony Joseph Servino* of counsel), for appellant.

*Litman, Friedman, Kaufman & Asche* (*Richard M. Asche, Lewis R. Friedman, Herman Kaufman, Jack T. Litman* and *Russell M. Gioiella* of counsel), for respondent.

#### OPINION OF THE COURT

MOLLEN, P. J.

On this appeal, we are called upon to determine the lawfulness of a warrantless search of the defendant's apartment by police who had been summoned to investigate a shooting. The case reaches us in the posture of an appeal by the People from so much of an order as suppressed certain evidence found in the course of the search.

On the evening of September 24, 1976 the police received a telephone call that someone had been shot at the condominium apartment shared by Dr. Seymour Cohen and his wife, defendant Patricia Cohen. The first officer arrived at the apartment at approximately 11:45 P.M. and met the defendant who directed him upstairs to the bedroom. There he discovered Dr. Cohen, lying on the bed, bleeding from

an apparent gunshot wound to the head. An automatic pistol lay alongside him. The defendant told the officer that her husband had apparently shot himself as she lay beside him asleep in their bed.

Arriving police officers administered first aid to Dr. Cohen and then removed him to a hospital where he later died of his wound. The defendant, apparently grief-stricken, was permitted to go to the hospital to be with her husband.

Meanwhile officers began searching the apartment for suicide notes, other weapons, and the presence of possible intruders who might have been responsible for the shooting and who might still be hiding on the premises. The police seized the gun found on the bed as well as two notes which were lying in open view on a table in the bedroom. They also discovered and seized two live rounds and a spent shell casing. Later they found the bullet which had apparently passed through Dr. Cohen's head. Other tangible evidence was also seized from the apartment and from the Cohens' car.

At approximately 3:00 A.M., the last officers left the apartment. Having no key, they were unable to lock the door. They did, however, arrange to have officers on patrol in the area keep an eye on the apartment since they knew that the police would return the next morning to continue the investigation and search.

The following day, the police received word from the medical examiner's office that the nature of Dr. Cohen's wound raised suspicions that his death had been a homicide rather than a suicide. At approximately 10:30 or 11:00 A.M., police officials and the medical examiner returned to the condominium and searched the apartment "from top to bottom", seizing physical property, taking photographs and measurements, and re-enacting the shooting. At approximately 12:30 P.M., the defendant arrived accompanied by her father. She was escorted by the police to her son's room where she was permitted to take some of his clothing. She was told that the apartment would be sealed off and, indeed, when the police left at approximately 1:00 P.M., they padlocked the door. Police officers returned to the

apartment on at least two subsequent occasions, seizing additional evidence.

At no time did the police obtain or apply for a warrant to search the apartment.

The defendant was subsequently indicted for the murder of her husband. Following a jury trial, she was convicted of murder in the second degree and criminal possession of a weapon in the second and third degrees. Ultimately, citing trial errors which are not relevant to the instant appeal, the Court of Appeals, *inter alia,* reversed the defendant's murder conviction and ordered a new trial (see *People v Cohen,* 50 NY2d 908, revg 71 AD2d 687).

Upon remand to the County Court, the defendant for the first time moved to suppress certain statements she had made and certain physical evidence seized from her apartment. She explained her failure to make such a motion earlier by contending that her statements were subject to suppression only under recently announced State law, and that the branch of her motion which was to suppress physical evidence was grounded on facts first learned at her trial.

Eventually, the defendant was afforded a hearing on both branches of her suppression motion. At the conclusion of the hearing, the court, *inter alia,* suppressed all tangible evidence seized and all observations made at the Cohens' apartment after 3:00 A.M. on September 25, 1976. It is from this portion of the court's order that the People now appeal. There should be an affirmance.

In arguing that the police lawfully seized evidence upon their re-entry into the defendant's apartment, the People rely largely on our holding in *People v Neulist* (43 AD2d 150). The defendant, on the other hand, contends that *Neulist* no longer represents the law because it is irreconcilable with the Supreme Court's later decision in *Mincey v Arizona* (437 US 385). We need not reach the question of whether *Neulist* remains viable, however, because we conclude that it is plainly distinguishable from the case at bar.

In *Neulist* (*supra*), the police arrived at the defendant's home in response to a report that his wife had been found dead in the bedroom. A preliminary investigation and

medical examination led to a tentative determination that death had resulted from natural causes, although the possibility of homicide was not ruled out. When the body was removed fröm the house, most of the officers left the scene. Policemen were posted as guards, however, and were instructed to permit no one to enter the decedent's bedroom. No restrictions were placed upon the family's use of the rest of the house. Within an hour of the police departure, detectives returned to the house, having been informed that an autopsy disclosed that the decedent had been shot to death. The returning detectives conducted a search and seized certain evidence which was later sought to be used against the defendant.

In upholding the admissibility of the evidence seized in the course of this warrantless search, we wrote that "[t]he crucial elements [were] the posting of the guard, thereby establishing a continuing police presence on the scene, and the relatively brief lapse of time between the removal of the body and the continuation of the investigation." (*People v Neulist,* 43 AD2d 150, 155, *supra.*) In the case at bar, these "crucial elements" are absent. The police here posted no guard and, hence, when they left the apartment at 3:00 A.M., the police presence at the scene came to an end. Moreover, the investigation here did not resume until some eight hours after the police left the scene. We note additionally that, in *Neulist,* as the search progressed, officers applied for and obtained four search warrants in connection with the case. In contrast, in the instant case, there was no effort to obtain a warrant.

Similarly distinguishable is our recent holding in *People v Dancey* (84 AD2d 763). There, the defendant sought police assistance, claiming that she was locked out of her apartment in which her five-month-old baby had been placed in a plastic bag. At the defendant's request, officers broke into the apartment and, in a closet to which the defendant directed them, they discovered the child "apparently deceased". The officers rushed the baby to the hospital in an unsuccessful attempt to save its life. Meanwhile, the defendant accused her husband of having placed the baby in the bag. Shortly thereafter an officer was directed

to return to the apartment to guard against the loss of relevant evidence.

At the precinct, the defendant changed her story and admitted placing the baby in the bag. An investigating detective then returned to the apartment, which was still under police guard, "not to search the premises, nor to gather evidence * * * [but] to better view the physical layout of the place in order to better understand the statements that were being given to him" (*People v Dancey, supra,* p 763). While there, he observed in plain view a note addressed to the defendant's husband. The note, which contained statements incriminating the defendant, was seized and was later used against the defendant at her trial for the homicide. We upheld the admissibility of the note, writing (p 764): "In this case the investigating detective went to the apartment, which was already occupied by a police guard. His entrance into the apartment constituted no more of an intrusion into defendant's privacy than did the legitimate presence of the police guard * * * The detective was not there to search the premises, nor to gather evidence * * * He did not find the note pursuant to a search. It was in plain view. Since the police presence in the apartment was a legitimate response to the exigent need to safeguard the crime scene, and the detective's appearance and activities did not exceed the ambit of that presence, the detective had the right to seize evidence in plain view". We distinguished *Mincey v Arizona* (437 US 385, *supra*), noting that (p 764) "[w]hat was disapproved by the Supreme Court [in *Mincey*] was a four-day warrantless search by * * * detectives who were there for the purpose of finding and seizing evidence to support a prosecution."

In *Mincey* (*supra*), an undercover officer was shot and killed during a narcotics raid on the defendant's apartment conducted by the officer and several other plainclothes policemen. After the shooting, the officers quickly looked around the apartment for other victims and discovered the wounded defendant and two other injured occupants. They did not conduct any further search, however, nor did they seize evidence. Instead, they merely guarded the suspects and the premises for 10 minutes until homicide detectives arrived to take charge of the investigation. Upon their

arrival, the detectives began a search which (p 389) "lasted four days, during which period the entire apartment was searched, photographed, and diagrammed. The officers opened drawers, closets, and cupboards, and inspected their contents; they emptied clothing pockets; they dug bullet fragments out of the walls and floors; they pulled up sections of the carpet and removed them for examination. Every item in the apartment was closely examined and inventoried, and 200 to 300 objects were seized. In short, Mincey's apartment was subjected to an exhaustive and intrusive search. No warrant was ever obtained."

In holding that the search contravened the Fourth Amendment, the Supreme Court rejected the notion that there was a "murder scene exception" to the warrant requirement. Finding no exigent circumstances to justify the exhaustive four-day search, the court held that a warrant should have been sought, and noted that a police guard at the apartment would have minimized the possibility that evidence might be lost, destroyed or removed during the time required to obtain the warrant. In reaching its decision, the Supreme Court observed (*Mincey v Arizona, supra,* pp 392-393): "We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. * * * And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." The court concluded, however, that (p 393) "a four-day search that included opening dresser drawers and ripping up carpets can hardly be rationalized in terms of the legitimate concerns that justify an emergency search."

It would appear, then, that, when a constitutionally protected area becomes the scene of a crime, the police may subject the premises to a preliminary search and inspection whose scope and duration must be limited by and

reasonably related to the exigencies of the situation. Once that preliminary investigation has come to an end, however, no further searches for evidence may be conducted on the premises unless authorized by a warrant.

In the case at bar, the police concluded their preliminary investigation at 3:00 A.M. when they left the Cohen apartment without maintaining a continuing police presence and without returning to the unguarded premises for nearly eight hours. Upon their return, they proceed to conduct an exhaustive and intrusive "top to bottom" search for evidence without having made any attempt to obtain a warrant. Such conduct, plainly inconsistent with the principles announced in *Neulist, Dancey* and *Mincey (supra)* cannot be sanctioned. Accordingly, we hold that the court properly suppressed all evidence gathered by the police after their 3:00 A.M. departure from the defendant's apartment.

LAZER, MANGANO and NIEHOFF, JJ., concur.

Order, insofar as appealed from, unanimously affirmed.