■ The People of the State of New York, Respondent, v Matthew Friedman, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Queens County (Eiber, J.), rendered September 1, 1981, convicting him of criminal possession of a controlled substance in the fourth degree, upon his plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a hearing (Beldock, J.), of defendant's motion to suppress contraband and statements made to the police. Judgment affirmed and case remitted to the Supreme Court, Queens County, for further proceedings pursuant to CPL 460.50 (subd 5). On the morning of December 3, 1979, the superintendent of the apartment building in which the defendant resided was advised by another tenant that the door to defendant's apartment was open and that the possibility of a burglary existed. The superintendent thereupon called the police and two uniformed officers responded at or about 11:25 A.M. All three went to defendant's apartment, found the door open, and went in. The apartment apparently had been burglarized and during the ensuing half hour the officers remained on the premises while a broken bedroom window, the apparent means of entry, was repaired. The uniformed policemen were able to ascertain the telephone number of defendant's father and advised him of the burglary. Upon leaving the apartment, the superintendent automatically locked the door by slamming it shut. A little later in the day, defendant's mother learned of the burglary of her son's apartment and went to the apartment after an unsuccessful attempt to locate the two uniformed police officers. She neither had a key to, nor any possessory interest, in the apart-

ment. She therefore prevailed upon the superintendent to open the locked door, which he did with the aid of a venetian blind slat. After remaining in the apartment for a short time, she and the superintendent departed and the latter automatically locked the door in the manner which he had previously employed. The mother proceeded to the precinct and, after again failing to ascertain the whereabouts of the two uniformed officers who had investigated the burglary, called her husband, who expressed his concern that their son, a jewelry salesman, might have been abducted by the burglar. At this point the mother conveyed her concern and that of her husband to two detectives, explaining that the door to the apartment had been discovered ajar, that the bedroom light had been left on overnight, that her son's car was still in its garage, and that he had failed to keep a scheduled appointment. The mother was thereupon advised to file a missing person report, and while she was in the process of doing so, the detectives proceeded, at approximately 3:30 P.M., to the defendant's apartment house. Upon their arrival at the apartment house, the two detectives met the defendant's mother, and, together with the superintendent, proceeded to the defendant's apartment, where they found the front door ajar. They thereupon entered the apartment and saw drugs and drug paraphernalia in plain view. Shortly thereafter, the defendant came running into the apartment in a highly excited state and immediately exclaimed that "his life was ruined, his jewelry was stolen" (it appears from the record that the defendant had met the superintendent and was told of the burglary before he reached his apartment). Defendant's outburst when he first entered the apartment, i.e., that "his life was ruined", was related solely to his discovery of the burglary. The detectives immediately arrested defendant for possession of drugs and, after being given *Miranda* rights, which he acknowledged that he understood, the defendant again stated that his life was ruined because of the stolen jewelry and also stated that "he only kept it [the drugs] for himself". A search of a pouch carried by the defendant also disclosed a small amount of marijuana and cocaine. In denying defendant's motion to suppress the physical evidence and his statements, Criminal Term, as the trier of fact, accepted the testimony of Detective McNamara and made two critical findings of fact: (1) that the detectives found the door to the defendant's apartment ajar and thereupon entered the apartment; and (2) that upon their entry into the apartment, the detectives saw the contraband and paraphernalia in plain view. Although the testimony on these two matters (as well as other collateral matters) was seriously impeached at trial, Criminal Term's findings of fact, which were based on the testimony of Detective McNamara, do have support in the record and have been accepted by this court for the purpose of resolving the issues on this appeal. Criminal Term held that the detectives entered the apartment lawfully because of the mother's desire to have them investigate the burglary and to pursue her missing person report. We affirm. In *People v Cohen* (87 AD2d 77, 82-83, affd 58 NY2d 844), this court held that: "when a constitutionally protected area becomes the scene of a crime, the police may subject the premises to a preliminary search and inspection whose scope and duration must be limited by and reasonably related to the exigencies of the situation. *Once that preliminary investigation has come to an end, however, no further searches for evidence may be conducted on the premises unless authorized by a warrant*" (emphasis supplied). While *People v Cohen* (*supra*) would clearly bar a subsequent re-entry into the defendant's apartment in a case such as this for the ostensible purpose of continuing the *burglary* investigation, in our view the situation is markedly different where, as here, the police are subsequently presented with reasonable cause to believe that the premises in question may also have been the situs of another crime with life-threatening potential, to wit: a kidnapping. Thus, the detectives in this case were person-

ally confronted with the presumed victim's mother, and were presented with empirical data leading to the reasonable conclusion that the defendant had vanished under circumstances which were not inconsistent with foul play. In addition, a missing person report had already been filed by the defendant's mother. Under these circumstances, the detectives were duty-bound to investigate, and in the discharge of their duty reasonably followed their only lead and went to the apparent place of the disappearance, i.e., the defendant's apartment. Finding the door ajar, they entered not to seize evidence or to duplicate the burglary investigation which had already been completed by uniformed officers, but rather to look for clues relating to the defendant's possible abduction. Clearly, in any such investigation, time is of the essence, for in the attempt to follow the trail of a kidnapper, the path can easily grow cold. Moreover, the life of the victim can often hang in the balance (see *People v Knapp,* 57 NY2d 161, 180-189 [dissenting opn of Wachtler, J.]). Accordingly, the detectives in this case acted reasonably in response to the exigencies presented by the mother's timely report of her son's disappearance, and their warrantless entry into the defendant's apartment for the purpose of investigating his apparent abduction was justified. Lazer, J. P., Gulotta, Bracken and Boyers, JJ., concur.