**STATE of Maine**

v.

**Nancy A. FREDETTE.**

Supreme Judicial Court of Maine.

Sept. 28, 1979.

**66**

Richard S. Cohen, Atty. Gen., William R. Stokes (orally), Asst. Atty. Gen., Augusta, for plaintiff.

Glassman, Beagle & Ridge by Caroline Glassman (orally), C. Alan Beagle, Portland, for defendant.

Before McKUSICK, C. J., and ARCHI-BALD, POMEROY and WERNICK, JJ. and DELAHANTY, A.R.J.

ARCHIBALD, Justice.

On September 8, 1978, Nancy A. Fredette was indicted for the May 26, 1978, murder [1] of her husband, Frederick R. Fredette, which allegedly "was committed with the use of a firearm." That indictment remains untried because of the two interlocutory rulings now under consideration here.

On January 25, 1979, Mrs. Fredette filed two motions to suppress evidence, namely:

1. Evidence of her "personal or family financial transactions or condition" obtained without a search warrant from "banks or other savings institution"; and

2. "All personal and intangible property seized" without a search warrant "from [her] premises located at 55 Birch Street, Biddeford, Maine after 7:34 a. m. on May 26, 1978."

A justice of the Superior Court ordered:

1. The State may not use as evidence . . . records of Defendant's financial affairs and transactions obtained by the State from banks or other savings institutions . . . .

2. The Defendant's motion to suppress evidence obtained from a warrantless search of her home is denied.

The State, as authorized by 15 M.R.S.A. § 2115–A (1978 Supp.) and Rule 37A(d), M.R.Crim.P., seasonably appealed from that part of the interlocutory ruling adverse to it, namely, suppressing the defendant's bank records. The defendant successfully moved for an interlocutory order reporting the denial of her motion to suppress the evidence obtained in the warrantless search of her house. Rule 37A(b), M.R.Crim.P.

We sustain the State's appeal. We affirm the decision of the justice below in refusing to suppress the evidence obtained in the warrantless search of the defendant's house.

## SUPPRESSION OF FINANCIAL RECORDS

In concluding that the bank records should be suppressed, the justice premised that result on the assumption that "the search and seizure of a Defendant's records

---

1. 17–A M.R.S.A. § 201(1)(A) provides:
 § 201. Murder.
 (1) A person is guilty of murder if:

(A) He intentionally or knowingly causes the death of another human being.

from his bank must be accomplished by the use of appropriate legal process." Since the State had "failed to present evidence to the court *at the hearing*" that legal process was used, the justice ordered the evidence suppressed, citing as ultimate authority *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) and *Burrows v. Superior Court of San Bernardino County*, 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1974).[2]

*Miller*, construing the Fourth Amendment to the Constitution of the United States, flatly holds that a bank depositor has no interest protected by that constitutional amendment that would entitle him to challenge the method by which information revealed by his bank transactions was obtained. In short, "The depositor takes the risk, in revealing his affairs to another [e. g., a bank employee], that the information will be conveyed by that person to the Government." 425 U.S. at 443, 96 S.Ct. at 1624. Lest it be argued that the legal rule espoused in *Miller* should be reviewed as no longer viable, we note its recent citation with approval in *Smith v. Maryland,* 442 U.S. 735, 743, 99 S.Ct. 2577, 2581, 61 L.Ed.2d 220 (1979).

█ Defendant argues, however, that the right of privacy secured by Article I, Section 5 [3] of the Constitution of Maine mandates the suppression of bank records obtained by the State without legal process. It has been the consistent position of this court not to adopt an exclusionary rule pursuant to our Constitution when the United States Supreme Court has not applied such a rule to the states under the Fourth and Fourteenth Amendments to the Constitution of the United States. *See, e. g., State*

v. ʳoisy, Me., 384 A.2d 42, 44 n.2 (1978); *State v. Stone*, Me., 294 A.2d 683, 693 n.15 (1972); *State v. Hawkins*, Me., 261 A.2d 255, 258 n.3 (1970).

█ We see no reason to depart from this established policy.[4] Since Mrs. Fredette had no expectation of privacy in her bank records that was constitutionally protected, their revelation to police agencies, whether by subpoena or otherwise, cannot be suppressed. Thus, the presence, or absence, in the record of the hearing below of legal process, defective or otherwise, becomes an improper basis for the suppression of those records. The justice below erroneously ordered the suppression of the defendant's bank records.

## REFUSAL TO SUPPRESS EVIDENCE SEIZED IN A WARRANTLESS SEARCH OF DEFENDANT'S HOME

In denying the defendant's motion to suppress evidence obtained through the warrantless search of the Fredette residence, the presiding justice declared:

With respect to the search of Defendant's home, the court believes that Defendant consented to the police investigation of her home. In response to a call from a woman claiming that someone had just shot her husband, police arrived at Defendant's home and entered without objection from Defendant. In fact, Defendant fully cooperated with all of the investigative efforts of the police. Her conduct throughout conveyed only approval and encouragement of the police in their search. Since the court finds that Defendant consented to the search of her home, it need not reach the further question whether the police could consti-

---

**2.** *Burrows* and *Miller* are readily distinguishable as Mr. Justice Powell points out in footnote 7 in *Miller*, being undoubtedly motivated to make this distinction in view of the dissent of Mr. Justice Brennan who quoted at length from *Burrows*. 425 U.S. 445 n.7, 96 S.Ct. 1625 n.7.

**3.** Section 5. The people shall be secure in their persons, houses, papers and possessions from all unreasonable searches and seizures . . . .

**4.** 9–B M.R.S.A. § 163 establishes the procedure by which financial records may be obtained by "subpoena, summons, warrant or court order" on a fiduciary institution. Even if we assume that the State did not comply with § 163, we would be disinclined at this time to apply an exclusionary rule. Section 163 does not mandate such a rule, and there is not the slightest suggestion on the facts here that such a rule is necessary to deter unlawful governmental conduct.

tutionally search the home without a warrant.

■ The presiding justice acts as a finder of fact in preliminary proceedings relating to the admissibility of evidence. His findings will not ordinarily be set aside unless clearly erroneous. *See, e. g., State v. Carter*, Me., 391 A.2d 344, 346 (1978); *State v. McLain*, Me., 367 A.2d 213, 217 (1976); *State v. Fernald*, Me., 248 A.2d 754, 763 (1968).

■ Well settled is the rule of law that a search conducted without a warrant is *per se* unreasonable unless the search comes within one of a few specifically established exceptions to the rule. A search conducted pursuant to consent is one of those clearly delineated exceptions to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Mitchell*, Me., 390 A.2d 495, 499 (1978); *State v. McLain*, 367 A.2d at 216. Upon a motion to suppress the fruits of a warrantless search the State carries the burden of demonstrating by a preponderance of the evidence (*Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *State v. Koucoules*, Me., 343 A.2d 860, 872 (1974)) that an objective manifestation of consent was given by word or gesture by one bearing an appropriate relationship to the property searched. *See, e. g., State v. McLain*, 367 A.2d at 217. The consent must be shown to have been free and voluntary and not the product of coercion, whether express or implied. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

A somewhat detailed factual summary is required to demonstrate that the justice below correctly applied the foregoing legal standards in arriving at his ultimate conclusion.

Not in issue in the instant case is that Mrs. Fredette, who certainly bore an appropriate relationship to the searched residence, consented voluntarily by word and gesture to the *entry* of her home by the Biddeford police department on the morning of May 26, 1978.

Having received two telephone calls from a person ultimately determined to be the defendant, the Biddeford Police Department arrived at the defendant's home in the early morning of May 26, 1978. Defendant was crying and appeared to be hysterical, claiming that her husband had been shot. In response to questioning, the defendant denied knowledge of the assailant but stated that this person had left through a side entrance. She then ushered the police to the bedroom where her husband lay wounded, unconscious, but still alive.[5] After assisting ambulance attendants in moving Mr. Fredette to the ambulance, an officer ordered the home secured, which included placing officers at the entrances thereto. Mrs. Fredette was then told that the premises were to be searched and that other officers from other departments were being called for assistance. Mrs. Fredette did not object by either gesture or word to the statement of the police.

A Maine State Police officer somewhat later that same morning interviewed Mrs. Fredette at the Portland hospital. Mrs. Fredette asked, "Have they found anything at my home to indicate who would be responsible for what they have done to my husband?" Being informed that the officers were in the process of searching her home, Mrs. Fredette then said, "[I]f you find anything out there, would you let me know?" At no time during this conversation did Mrs. Fredette indicate any objection to the continued search of her home but, to the contrary, indicated a desire to know what the results might be.

During that day the premises were effectively secured by the police and Mrs. Fredette was informed that the purpose in so doing was to protect whatever evidence might exist relating to the shooting of her husband. Mrs. Fredette indicated her understanding of that situation. She said

5. Mr. Fredette ultimately died in a Portland hospital without having regained consciousness.

or did nothing to indicate her objection thereto.

While the premises were secured Mrs. Fredette on at least two occasions sought permission to re-enter the premises to obtain clothing for herself and her children. On both occasions she was accompanied by a police officer who expressly inventoried each item she removed. On neither of these occasions did she indicate any objection to the presence of the police in her home or their purpose in being there. Her attitude toward the police was completely cooperative. On one occasion on her return to her premises she inquired explicitly from the police if they had discovered anything to identify the perpetrator of the suspected murder, but she did not indicate, either by word or conduct, any desire to have the officers discontinue their search. In the afternoon of May 29th the police returned control of the premises to Mrs. Fredette but asked, and received, her permission to search her husband's truck. At that time Mrs. Fredette was accompanied by an attorney. Two days thereafter the police were requested by Mrs. Fredette's attorney to return to the residence in order that the washroom be searched for the presence of a gun.

There can be no doubt that the entry of the police into the Fredette home, and the conduct of Mrs. Fredette after the police had arrived, suggested her consent to their entry for the dual purpose of getting medical assistance for her husband and for determining who his assailant might have been. At no time did Mrs. Fredette make any statement or engage in any conduct which would lead the police to believe she was placing any limitation on their conduct while in possession of her home.

In *State v. Koucoules*, Me., 343 A.2d 860, 868 (1974), we stated:

A consent search is a limited and conditional search only insofar as the consenting party has expressly stated, or, under the reasonable man standard in the light of all the existing circumstances, is deemed in fact to have impliedly attached, certain limitations under which the officers are authorized by him to search. The character of the search is determined by the scope of the authorization as understood by reasonable men having knowledge of all the existing factual circumstances, and not by any limitational rule of law applicable to all consent searches.

The defendant not having expressly limited her consent to the police presence to either time, space, or purpose, we must consider whether the police who responded to her plea for assistance should have understood from all the circumstances that Mrs. Fredette desired only a limited search of her home. We conclude that knowing all of the existing factual circumstances, the police could reasonably understand that Mrs. Fredette had placed no limitation upon her consent for the search of her home. When initially told of the extensive search proposed by state police, Mrs. Fredette made no objection. Later that morning Mrs. Fredette expressed an interest in whether the investigators had uncovered any clues at her home. She did not at that time intimate a desire to limit the scope of the search of her home but instead asked that she be kept informed of the investigation's progress. The cooperative attitude of Mrs. Fredette when forced to be accompanied by the state police as she obtained clothes both for herself and her children would also not convey to the police a desire by her to terminate her consent or limit the search then being conducted.

The defendant also argues that any consent given by her was not demonstrated by the State to have been voluntary. In particular, the defendant contends that she was unaware of her right to object to the search and that the subjective belief of the police in their right to search without a warrant on the authority of the "homicide scene" exception to the warrant requirement was a coercive influence.

█ Although the State did not demonstrate the defendant's awareness of her right to object to the warrantless search of her home, such a showing is not essential to proof of voluntary consent.

[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Schneckloth v. Bustamonte*, 412 U.S. at 248–49, 93 S.Ct. at 2059.

 Finally, the subjective belief of the police in their right to search the defendant's home irrespective of any consent and the defendant's voluntary consent to a search of her home are not mutually exclusive. Although the subjective attitude of the police is certainly a factor that must be weighed in determining whether the consent offered was in fact voluntary, it is not a factor that is alone determinative. In the instant case the conclusion of the justice below that the defendant's consent was not the product of police coercion is warranted on the basis of several facts: the defendant initiated police presence through her urgent calls to the police; she invited them to enter her home before they understood the extent of the victim's injuries and the possible applicability of the "homicide scene" exception; and the defendant continually cooperated with the police as they conducted the search of her home.

In summary, we believe sufficient credible evidence was presented upon which the justice below could properly conclude that the defendant voluntarily consented to a search of her home on the morning of May 26, 1978, and she did not at that time or any time thereafter until the return of the control of her residence express or imply by word or gesture a limitation upon the scope of the allowable search.

The entries are:

The State's appeal of the March 14, 1979 order suppressing evidence of the defendant's financial affairs and transactions is sustained, and the order is vacated.

The March 14, 1979 order denying the suppression of evidence obtained from a warrantless search of defendant's home is affirmed.

Case remanded for further proceedings.

GODFREY and NICHOLS, JJ., did not sit.

DELAHANTY, J., sat at oral argument and conference but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.

DUFRESNE, Active Retired Justice[1] (concurring in result only respecting the State's appeal; concurring fully in connection with the defendant's appeal).

I agree entirely with the reasoning of the majority insofar as they deny the defendant's appeal and affirm the Superior Court's order of March 14, 1979 disallowing the defendant's motion to suppress evidence obtained in a warrantless search of the defendant's home.

In connection with the State's appeal, I agree with the result reached by the majority in that the State's appeal must be sustained and the Superior Court's order of March 14, 1979 suppressing certain evidence of the defendant's financial affairs and transactions (information and records allegedly obtained in violation of law) must be vacated. With the greatest respect for my colleagues' opinion, I cannot, however, subscribe to the basis upon which they rest their conclusion.

The decision of the Superior Court Justice which we are now upsetting reads as follows:

"In the instant case, the State has failed to present evidence to the court at the hearing on this motion to suppress to prove that it secured Defendant's bank records through the use of legal process.

---

1. Sitting by assignment.

*See* 9–B M.R.S.A. §§ 161–164. Since the State has failed to establish that it used legal process to obtain Defendant's financial records, evidence relating to those records must be suppressed." (Emphasis in original)

The rationale underlying the majority's decision, with which I respectfully disagree, may be gleaned from the following excerpt:

"Since Mrs. Fredette had no expectation of privacy in her bank records that was constitutionally protected, their revelation to police agencies, whether by subpoena or otherwise, cannot be suppressed. Thus, the presence, or absence, in the record of the hearing below of legal process, defective or otherwise, becomes an improper basis for the suppression of those records."

Rule 41(b), M.R.Crim.P. authorizes the issuance of a search warrant for the purpose of searching for and seizing "any property . . . . (4) Consisting of non-testimonial evidence which will aid in a particular apprehension or conviction," the warrant to issue only "[i]f the judge or complaint justice is satisfied that grounds for the application exist or that there is probable cause to believe that they exist." The rule (Rule 41(e)) further provides that

"[a] person aggrieved by an unlawful search and seizure may move the Superior Court in the county in which the property was seized for the return of the property and to suppress for use as evidence anything so obtained on the ground that:

(1) The property was *illegally* seized without warrant, or . . . ." (Emphasis supplied)

As an initial observation, let me say that Rule 41 nowhere limits its application to the suppression of evidence which is illegal, because it was obtained in violation of a constitutional proscription such as, for example, evidence procured contrary to Fourth-Fourteenth Amendment rights, as distinguished from evidence which is illegal, because it was secured in violation of statutory law. Also, Rule 41 carries no statement of intent that it was formulated for the sole purpose of deterring enforcement authorities from violating constitutional or statutory law, as distinguished from the purview of providing direct implementation of constitutional or statutory mandates. In other words, the deterrence rationale of the so-called exclusionary rule was not integrated in our rule 41, either expressly or impliedly, as the sole reason for its existence.

I do recognize that the rule itself (Rule 41(b)) uses the word "may", when it states that "[a] warrant may be issued under this rule to search for and seize . . . property . . . [c]onsisting of non-testimonial evidence which will aid in a particular apprehension or conviction," and that, when used in a statute or rule,[2] the word "may" is ordinarily interpreted as permissive, discretionary, and not mandatory. But this Court, in *Collins v. State*, 161 Me. 445, 213 A.2d 835 (1965), quoted with approval the following passage from *Low v. Dunham*, 61 Me. 566, 569 (1872), wherein the Court stated that sometimes legal principles require that the word "may" be given the sense of "shall" or "must:"

"The word 'may' in a statute is to be construed 'must' or 'shall,' where the public interest or rights are concerned, and the public or third persons have a claim *de jure* that the power shall be exercised." (Emphasis in original)

The Legislature's grant of the right of privacy to bank depositors' financial records created valuable rights in a substantial portion of the public generally, the protection of these rights mandating that the power to issue warrants of search and seizure in connection with bank deposits or other depositor financial records be exercised, and this upon the conditions stated in 9–B M.R.S.A., § 163. Undoubtedly, the word "may" was used to allow for well recognized excep-

---

**2.** For cases, where statutory rules of construction are stated to be applicable in interpreting our rules of criminal procedure, see *Shorette v. State*, Me., 402 A.2d 450, 460 (1979); *Cote v. State*, Me., 286 A.2d 868, 869 (1972); *Tuttle v. State*, 158 Me. 150, 180 A.2d 608, cert. denied, 371 U.S. 879, 83 S.Ct. 151, 9 L.Ed.2d 116 (1962).

tions, such as when consent is given, or exigent circumstances may exist, or, as in this case, where the Confidential Financial Records Act under specific circumstances expressly dispenses with the service of the warrant upon the fiduciary institution's customer.

In 1977 the Legislature amended Title 9–B regulating the fiduciary institutions of the State and established for the first time the privilege of confidentiality respecting all financial records therein, except in specially exempted situations. P.L.1977, c. 416. (9–B M.R.S.A., §§ 161–164).

Chapter 16 of Title 9–B provides in pertinent part as follows:

### Confidential Financial Records

§ 162. *Disclosure of financial records prohibited; exceptions*

A fiduciary institution may not disclose to any person, except to the customer or his duly authorized agent, any financial records relating to that customer of that fiduciary institution unless:

1. *Authorized disclosure.* The customer has authorized disclosure to the person; or

2. *Disclosure in response to legal process.* The financial records are disclosed in· response to a lawful subpoena, summons, warrant or court order which meets the requirements of section 163.

§ 163. *Subpoena, summons, warrant or court order*

1. *Service.* A fiduciary institution shall disclose financial records under section 162 pursuant to a subpoena, summons, warrant or court order which on its face appears to have been issued upon lawful authority only if the subpoena, summons, warrant or court order is first served upon the customer and then upon the fiduciary institution. The court for good cause shown may delay or dispense with service of the subpoena, summons, warrant or court order upon the customer. The court shall delay or dispense with service of the subpoena, summons, warrant or court order upon the customer upon notice by the Attorney General or

b·s designee that such service upon the customer would not be in the public interest.

§ 164. *Penalties*

1. *Violation.* Any officer or employee of a fiduciary institution or consumer reporting agency who intentionally or knowingly furnishes financial records in violation of this chapter commits a, civil violation and shall be subject to a civil penalty of not more than $1,000.

2. *Inducing violation.* Any person who intentionally or knowingly induces or attempts to induce any officer or employee of a fiduciary institution or consumer reporting agency to disclose financial records in violation of this subtitle commits a civil violation and shall be subject to a civil penalty of not more than $1,000.

As stated previously, my colleagues now rule that, even in the absence of proof of compliance with the reference statute and notwithstanding a possible and perhaps probable violation thereof, the use in evidence of Mrs. Fredette's confidential financial records cannot be suppressed for the reason that Mrs. Fredette had *no expectation of privacy* in her bank records *that was constitutionally protected.*

*State v. Schoppe,* 113 Me. 10, 92 A. 867 (1915) is *the* case which prior to *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), purportedly reiterated the rule followed in Maine and in the majority of jurisdictions to the effect that a person could be proven guilty of crime upon evidence obtained illegally. In *Schoppe,* the Court stated:

"The defendant is none the less guilty, however the government may obtain possession of his person. If a complaint is made against one for larceny, and a search warrant is granted, and the stolen goods found, the thief is not to be discharged when his guilt is fully established, because the officer in serving the warrant may have exceeded his authority, *or the complainant may not have had sufficient reasons for the belief upon which his complaint was based* [lack of probable cause for search]." (Emphasis provided)

*Mapp v. Ohio,* supra, did compel this Court to abandon the *Schoppe* rule, so-called, which stands for the principle that the fruits of an illegal search, if they establish guilt, are justifiably admissible in evidence at trial, even though such evidence was obtained illegally.

Our Court has ruled in *State v. Fletcher,* Me., 288 A.2d 92, 98 (1972) that

"just as probable cause for an arrest cannot be justified upon facts learned after the arrest (*State v. Hawkins,* . . . [Me., 261 A.2d 255 (1970)]), neither can probable cause for the search be bolstered by evidence. discovered in the search."

This was an outright and unconditional overruling of *State v. Schoppe,* supra, and an unequivocal repudiation of the doctrine that *Schoppe* stands for, i. e. that, even if a seizure is illegal, the illegally obtained evidence is admissible to prove guilt. As I stated in my dissenting opinion in *State v. Caron,* Me., 334 A.2d 495, at 507 (1975):

"To the extent that *State v. Schoppe,* supra, and the cases which the *Schoppe* Court purported to follow, express a contrary view respecting the reasonableness of searches and seizures within the meaning of Article I, Section 5 of the Constitution of Maine and concerning the applicability of the exclusionary rule to evidence obtained in violation of the State constitutional right of privacy, I would overrule them."

The instant case differs from *State v. Caron,* supra, in that, here, we are dealing with illegally obtained evidence sought to be suppressed in a criminal prosecution, to wit, murder, pursuant to 17–A M.R.S.A., § 201(1)(A). The record indicates that the evidence was obtained by an Assistant Attorney General for presentation to the Grand Jury in the investigation of the death of Frederick R. Fredette, the defendant's husband. Even at that initial stage, the evidence of the defendant's private holdings in the several relevant fiduciary (banking) institutions was sought to be used in a criminal prosecution. A grand jury is an integral part in the criminal process, and proceedings before it are definitely "criminal proceedings" within the meaning of those terms as stated in Rule 1, M.R. Crim.P.,[3] and, thus, within the scope of Rule 41 of our rules of criminal procedure. See *State v. Carroll,* 83 Wash.2d 109, 515 P.2d 1299 (1973); *Bacon v. United States,* 449 F.2d 933 (9th Cir., 1971); *Schwimmer v. United States,* 232 F.2d 855 (8th Cir., 1956); *Ex parte January,* 295 Mo. 653, 246 S.W. 241, 243 (1922). See also *Gendron v. Burnham,* 146 Me. 387, 82 A.2d 773, 38 A.L.R.2d 210 (1951). Cf. *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

The Confidential Financial Records Act (9–B M.R.S.A., §§ 161–164) has established a limited right of privacy for the benefit of all depositors in financial institutions in the State of Maine. Under this law, depositors in Maine banking institutions have an expectation of privacy in their bank records, at least to the extent delimited by the statute. I agree readily that such right of privacy is not rooted in the constitution, but is derived wholly from statutory enactment. However, this Court should apply the exclusionary rule, not only as a sanction against constitutional intrusions of privacy, but also in deference to legislative prohibitions. I believe that the supervisory powers of the Supreme Judicial Court over the administration of criminal justice in the courts of this State imply the duty of establishing and maintaining proper standards of procedure and evidence (see *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943)); these have been provided in Rule 41 of our rules of criminal procedure. The Supreme Judicial Court has further carried out that duty by formulating Rule 501, M.R.Evid., which states in pertinent part:

"*Except as otherwise provided by* Constitution or *statute* or by these or other rules promulgated by the Supreme Judi-

---

**3.** Rule 1, M.R.Crim.P. provides in pertinent part:

"These rules govern the procedure in the Superior Court in all criminal proceedings . . . ."

cial Court of this state *no person has a privilege to*:

\* \* \* \* \* \*

(4) *Prevent another* being a witness or *disclosing any matter* or producing any object or writing." (Emphasis added) Hence, within the spirit of Rule 501, M.R. Evid., our Rule 41(e), M.R.Crim.P., which permits a person aggrieved by an unlawful search and seizure to move to suppress for use as evidence property illegally seized without a warrant, should be extended to vindicate the right of privacy created by 9-B M.R.S.A., §§ 161–164, if such remedial relief were within legislative intendment.

To apply the *Schoppe* concept in reaching their conclusion, the majority disregards "the imperial of judicial integrity" which requires that the judiciary not abet in any way the violation of statutory law. As quoted in *State v. Hawkins*, supra, from *Mapp v. Ohio*, supra: "Nothing can destroy a government more quickly than its failure to observe its own laws."

In the instant case, however, there is no occasion to apply the exclusionary rule. In *Ace Tire Co., Inc. v. Municipal Officers of Waterville*, Me., 302 A.2d 90, at 95 (1973), we said that the manner of enforcement of a statute is fundamentally a legislative and not a judicial question. Our Legislature made the intentional or knowing violation of the Confidential Financial Records Act *a civil violation* for which the offender subjects himself to *a civil penalty* of not more than $1000. Notwithstanding that the penalties provided for the transgression of a depositor's rights of privacy may be more or less illusory and offer little deterrence to prosecuting authorities who cannot be expected to prosecute themselves or the police, nevertheless the adequacy of the statutory remedy is solely for the Legislature to determine. *Perry v. Dodge*, 144 Me. 219, 67 A.2d 425 (1949); *Inhabitants of Town of Beals v. Beal*, 149 Me. 19, 98 A.2d 552 (1953).

The general rule is that where, as here, a statute creates a right and certain obligations thereunder which are unknown to the common law, the remedy provided therein for violation of the duties mandated by the statute is exclusive. Since the Legislature has subjected violators of the Confidential Financial Records Act to civil penalties, it is not proper for the courts to engraft additional sanctions, such as the exclusion of evidence obtained as a result of the statutory violation. *Ward v. Nationwide Mut. Fire Ins. Co.*, Fla.App., 364 So.2d 73 (1978); *Burland, Reiss, Murphy & Mosher v. Schmidt*, 78 Mich.App. 670, 261 N.W.2d 540 (1978); *Silverstein v. Sisters of Charity of Leavenworth*, 38 Colo.App. 286, 559 P.2d 716 (1977); *Hatfield v. Greco*, 87 Wash.2d 780, 557 P.2d 340 (1976); *National R. R. Passenger Corp. v. National Ass'n of R. R. Passengers*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). See also *Irving Trust Co. v. Orvis*, 139 Misc. 670, 248 N.Y.S. 771 (1931).

I agree that it was error for the Superior Court to suppress certain evidence of the defendant's financial affairs and transactions and do join my colleagues in sustaining the State's appeal, but on a basis different from that upon which they rest their conclusion.