■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LINDA DANCEY, Also Known as LINDA HICKMAN, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Kings County (Potoker, J.), rendered September 19, 1979, convicting her of manslaughter in the first degree, after a nonjury trial, and imposing sentence. Judgment affirmed. Defendant requested the assistance of police officers, because she was locked out of her apartment and her five-month-old baby was in a plastic bag within the apartment. Responding to her request, and pursuant to their obligation to help people in distress, the officers broke into the apartment. Defendant directed the officers to a closet, where the baby was found "apparently deceased". At this point defendant was accusing her husband of placing the baby in the bag. The officers rushed the baby to the hospital, in the hope that it could be revived. They were too late. Shortly thereafter a police officer was directed to the apartment in order to safeguard it. As a crime scene, the police believed it was necessary to prevent any possible intrusion into, or disruption of, the apartment which might result in the loss of relevant evidence. Defendant was asked to go to the local precinct to make a statement. At that time she was not under arrest or in custody; we see no reason to disagree with the trial court's findings in this regard. While being questioned about the details of what happened, defendant changed her story and admitted placing the baby in the bag. She was then read her *Miranda* rights and stated that she understood them and still wished to make a statement. Subsequently the investigating detective went to the apartment. His purpose was not to search the premises, nor to gather evidence. He wished to return to better view the physical layout of the place in order to better understand the statements that were being given to him. The police guard was still in the apartment. While the detective was there, he saw on a dresser, and in open view, a note with the name "Timmy" conspicuously visible inscribed thereon. "Timmy" was the name of defendant's husband. The detective picked up the note. It contained statements incriminating the defendant. Returning to the precinct, the detective asked her if she had written the note. She acknowledged that she had. Defendant argues that

this note should not have been admitted into evidence as its seizure violated her Fourth Amendment rights. The People maintain that defendant's original request for police assistance was a continuing request that the police investigate this crime, in and outside of her apartment, and that defendant's subsequent confession at the precinct did not affect her prior consent to the police entry into her apartment. Additionally, the People look to our decision in *People v Neulist* (43 AD2d 150) in support of the proposition that the police have a right to search the scene of a crime, where the initial police presence on the scene was prompted by the defendant's request and by the exigencies of the situation. Defendant argues that *People v Neulist (supra)* is no longer viable precedent in light of *Mincey v Arizona* (437 US 385). The facts in the case at bar are distinguishable from those in *Mincey v Arizona (supra)*. In that case, the United States Supreme Court (p 394) specifically approved the placing of officers at a crime scene in order to prevent the loss or destruction of evidence. What was disapproved by the Supreme Court was a four-day warrantless search by the detectives who were there for the purpose of finding and seizing evidence to support a prosecution. In this case the investigating detective went to the apartment, which was already occupied by a police guard. His entrance into the apartment constituted no more of an intrusion into defendant's privacy than did the legitimate presence of the police guard (cf. *People v Clements,* 37 NY2d 675). The detective was not there to search the premises, nor to gather evidence (cf. *People v Calhoun,* 49 NY2d 398). He did not find the note pursuant to a search. It was in plain view. Since the police presence in the apartment was a legitimate response to the exigent need to safeguard the crime scene, and the detective's appearance and activities did not exceed the ambit of that presence, the detective had the right to seize evidence in plain view (see *Coolidge v New Hampshire,* 403 US 443, reh den 404 US 874). We also conclude that defendant's admission and confessions were voluntarily made. She was informed of her *Miranda* rights, and voluntarily and intelligently waived those rights. The trial court's findings in this regard are supported by the record (see *People v Morales,* 62 AD2d 946). We have considered defendant's remaining contentions, and find them to be without merit. Damiani, J. P., Gulotta and Thompson, JJ., concur.

Gibbons, J., dissents and votes to reverse the judgment and order a new trial, with the following memorandum: In view of the rule expressed by the Supreme Court of the United States in *Mincey v Arizona* (437 US 385), that the possibility of a homicide does not create a "murder scene exception" which, in the absence of continuing exigent circumstances, dispenses with the demands of the Fourth Amendment, I am impelled to vote for reversal. The continued presence of a police guard at the scene of such crime is for the purpose of preventing the loss or destruction of evidence until the police have obtained a search warrant *(People v Knapp,* 52 NY2d 689). Under the factual posture of this matter, inasmuch as the initial exigent circumstances had come to an end and since no search warrant was sought or obtained, not only was the continuing presence of the police guard in the apartment unauthorized, but the later entry of the investigating detective, at which time he seized the note, was also without legal sanction. The seizure of the note cannot be justified upon the plain-view doctrine for the reason that the prerequisite of lawful presence by the police in the place of observation has not been satisfied (see *Harris v United States,* 390 US 234, 236). As noted, the fundamental holding in *Mincey (supra),* to which reference is now made, is that there is no "crime scene" exception to the Fourth Amendment prohibition against warrantless searches and seizures. The facts in *Mincey* are instructive. Police officers forced their way into the defendant's apartment, where an undercover drug sale had previously been arranged. The undercover officer who had arranged the deal slipped into the

apartment as an acquaintance of the defendant tried to slam the door. As the other officers entered, they heard a volley of gunshots and then observed the undercover officer collapse. He later died. The police did a quick search, looking for other victims. In fact, they found a wounded young woman and the defendant, also wounded. At that point the officers halted their investigation until a new unit arrived. They remained at the apartment guarding the suspects and the premises. The new unit arrived 10 minutes later. For the next four days the apartment was searched without a warrant. Photographs and diagrams of the apartment, taken and made during this period, along with items seized, were introduced at trial. The Arizona Supreme Court held that the items seized and the photographs and diagrams were admissible. That court held that, at the scene of a homicide, where officers were legally on the premises in the first instance, investigating officers had a right to search the scene for the purpose of determining the circumstances of death. The United States Supreme Court unanimously reversed the Arizona court's decision. It held that there was no homicide scene or crime scene exception to the general requirement that searches be made pursuant to a warrant, absent exigent circumstances. A police officer's right, in fact, duty, to respond to emergency situations was not questioned. Thus, for example, a warrantless entry and search may be justified where the officers reasonably believe that a person is dead or is in need of immediate aid, or where they are in hot pursuit of a suspected criminal, or where necessary to preserve evidence from loss or destruction *(Mincey v Arizona,* 437 US 385, *supra; Warden v Hayden,* 387 US 294; *People v Mitchell,* 39 NY2d 173; *People v Coley,* 83 AD2d 640). If evidence is seen in plain view by the officers during their response to such an emergency, it may be seized *(Mincey v Arizona, supra,* p 393). However, once the emergency has been dealt with and the situation is secure, any further search must be predicated upon a properly authorized warrant. Returning to *Mincey,* the implication of its holding is that any evidence discovered in plain view during the initial search of the apartment, when the officers were looking for additional victims and/or suspects, would be admissible. Other evidence, found during the search after the situation was secure and any exigencies dealt with, would be inadmissible (cf. *People v Fields,* 45 NY2d 986). The Supreme Court remanded the case for a determination of what evidence, if any, would be admissible under these "established Fourth Amendment standards" *(Mincey v Arizona, supra,* p 394, n 9). The majority seeks to distinguish *Mincey* on the ground that there was no search in this case. The detective allegedly found the note in plain view, while legitimately being in the apartment with the police guard who was on duty safeguarding the crime scene. It is true that in *Mincey* the United States Supreme Court approved of the procedure of safeguarding a crime scene in order to insure that evidence is not lost, destroyed, or removed *(Mincey v Arizona, supra,* p 394; see, also, *People v Clements,* 37 NY2d 675, 680-681, cert den *sub nom. Metzger v New York,* 425 US 911). However, it is also clear under *Mincey* that such a procedure is only proper, absent exigent need, when the scene is safeguarded while a search warrant is being obtained. The court specifically found a lack of exigent circumstances justifying the search because "[t]here was no indication that evidence would be lost, destroyed, or removed *during the time required to obtain a search warrant.* Indeed, the police guard at the apartment minimized that possibility. And there is no suggestion that a search warrant could not easily and conveniently have been obtained" *(Mincey v Arizona, supra,* p 394; emphasis supplied). Clearly, the posting of a policeman, under such circumstances, is for the purpose of maintaining the crime scene in an undisturbed state and to prevent a removal or destruction of evidence during the time required to obtain a search warrant. In the case at bar no warrant was obtained. The guard was in

the apartment preserving the scene for the arrival of a "crime scene unit" which was going to take photographs and dust for fingerprints, all without a warrant. Some three hours after the posting of the guard, the "unit" had, apparently, still not arrived, and the investigating detective showed up and found the note. The officer safeguarding the scene was not legitimately there, since no warrant was being obtained; nor does the record show that, during the interim, any attempt was even made to obtain a warrant. Under such circumstances, since the guard was not legitimately there, the detective's presence cannot be justified as being within "the ambit of [the guard's] presence", as the majority holds. It might be argued that taking photographs and dusting for fingerprints does not constitute a search under the Fourth Amendment, and that, therefore, the "crime scene unit" did not need to get a search warrant. Such a conclusion flies in the face of the facts of *Mincey,* where photographs were specifically included in the list of items erroneously admitted unless they fell within a traditional Fourth Amendment exception. It also ignores the proposition that "'[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion'" *(Payton v New York,* 445 US 573, 589-590, quoting from *Silverman v United States,* 365 US 505, 511). "A search is a quest for information" *(Lewis v State,* 126 Ga App 123, 126). It is a "'probing exploration for something that is concealed or hidden from the searcher'" *(United States v Marti,* 321 F Supp 59, 63; see, also, *State v Ashby,* 245 So 2d 225, 227 [Fla]). It "may be defined in this case as '*** an examination of one's premises *** with a view to the discovery of contraband or evidence *** to be used in prosecution of a criminal action'" *(United States v Clarke,* 451 F2d 584, 586, n 1, quoting from *Haerr v United States,* 240 F2d 533, 535). Under these very basic and almost elementary definitions of the word "search", it is clear that taking photographs and dusting for fingerprints in a person's apartment constitute a "search" of that residence. It has been argued, in a case which attempts to distinguish *Mincey,* that photograph taking at a crime scene is a way of memorializing what has already been seen in plain view during the initial, exigent search, and, therefore, such photographs are admissible despite the failure to get a warrant *(Commonwealth v Young,* __ Mass __, 416 NE2d 944, 950-951). Even if this is true, which is doubtful since photographs have a habit of revealing that which is not initially seen, it has no effect on this case because here the scene was being safeguarded for the dusting of fingerprints, which can scarcely be considered "memorializing" what has already been seen in plain view. Furthermore, photograph taking could, at most, be considered proper within the plain-view doctrine when the photographer has a right to be there in the first place *(Coolidge v New Hampshire,* 403 US 443, 465, reh den 404 US 874). If the police officers are at the crime scene without the presence of exigent circumstances, it can scarcely be said, after *Mincey,* that photograph taking is allowable under the plain-view doctrine (see *State v Eacret,* 40 Ore App 341; *People v Faine,* 88 Ill App 3d 387). I do not mean to suggest that photographs can never be taken without a warrant at a crime scene. It may well be necessary to take photographs quickly if the scene is about to be disturbed. For example, a medical examiner may want photographs of a body and its general location at a homicide scene before its removal. Such photographs would be proper under the preservation of evidence doctrine (see, e.g., *State v Anderson,* 42 Ore App 29, cert den 446 US 920). That exception has no application here, however, since the body of the victim was immediately taken to the hospital and there was no indication that any evidence might be lost, destroyed or removed. The bottom line, again, is that the investigating detective's presence in the apartment cannot be justified on the premise that the guard was properly on the scene, when no attempt was

being made to get a warrant. The majority argues that the investigating detective did not go to the apartment to search it. The detective, indeed, testified that he was not there "looking for evidence", but rather to "get a general idea of what the apartment layout was myself". However, the trial court, in its findings, characterized the visit as an "inspection" and a "search", but held that it was proper under *People v Neulist* (43 AD2d 150, 156), wherein this court stated that the police "had the right, indeed the duty, to examine the entire house." In so holding, this court found the facts and the decision in *State v Chapman* (250 A2d 203 [Me]), as being analogous and persuasive *(People v Neulist, supra,* p 155, n 2). It should be noted, however, that, since that time, the Supreme Judicial Court of Maine has recognized, in light of *Mincey,* that *Chapman* was incorrectly decided *(State v Johnson,* 413 A2d 931, 934 [Me]); and I am of the view that the continued viability of *People v Neulist (supra)* as a precedent is similarly affected. An intrusion into someone's apartment to "get a general idea" of its layout is a search within the Fourth Amendment, under the definitions of "search" already discussed. The detective was looking for information which he did not already have, in order "to gather support for [a] * * * prosecution" (see *People v Calhoun,* 49 NY2d 398, 405). There was no exigent need for him to be there, at least three hours after the initial police response, in order to prevent destruction of evidence, or to protect life and property, or to find out the cause of death (cf. *Michigan v Tyler,* 436 US 499, 510-511; *People v Calhoun, supra,* pp 403-406). He knew a homicide had occurred and he knew, almost for certain, where it had occurred: in defendant's apartment. At that point, under *Mincey,* he could have and should have obtained a search warrant before proceeding any further with his investigation in defendant's apartment *(State v Hodges,* 43 Ore App 547; cf. *People v Graham,* 69 AD2d 544, 548-549, vacated and remanded on other grounds 446 US 932). The People also argue that defendant's initial request for help justifies the later visit to her apartment under a consent theory. The People have a heavy burden of proving a voluntary consent and of showing that a search was indeed "the one to which the assent was given" *(United States v Sierra-Hernandez,* 581 F2d 760, 764, cert den 439 US 936; *People v Gonzalez,* 39 NY2d 122). In this case the People correctly point out that defendant's initial request that the police come to her apartment was ostensibly for the purpose of finding and helping the baby, and to aid the police in apprehending her husband, who lived elsewhere, as the perpetrator of the crime. Once the baby was located, taken to the hospital, and found to be dead, the first purpose can no longer be pointed to as justifying a further police presence at the apartment. At the point where defendant confessed, the second purpose falls out of the equation. She was no longer inculpating her husband, so it can hardly be said that she was still trying to aid the police in gathering evidence against him. It is significant that there is no indication that the defendant knew that the police had a guard at the apartment, or that she knew the detective was going to return after she confessed. The People argue that unless defendant manifested an intent to terminate her co-operation in the investigation, her original consent must be deemed to have continued. Such a proposition impermissibly shifts the burden of demonstrating consent onto defendant. Given her lack of knowledge about the police presence at the apartment, and the fact that her two reasons for communicating with the police no longer existed, there is no reason to assume a continuing consent (cf. *State v Fredette,* 411 A2d 65 [Me]; *People v Danzinger,* 41 NY2d 1092). Once she confessed, if she had been asked, defendant may well have wished to withhold her consent to a police search of her apartment, as she did when she refused, after confessing to the detective, to give a statement to an Assistant District Attorney. The People did not bear their burden of proving

consent. We have so far seen that the seizure of the note was improper because the detective was not lawfully in the apartment when he saw the note. There was no consent; he was there to search notwithstanding the fact that such search was improper without a warrant; by being there to search, his presence exceeded the authority allowed an officer safeguarding a scene for a proper search with a warrant; and the officer guarding the scene should not have been there either because he was guarding the scene for an investigation unit which was going to photograph and dust the apartment without a warrant. The seizure of the note was improper for yet another reason. Before an item of evidence can be seized under the plain-view doctrine, the officer must have a right to be where he is *(Harris v United States,* 390 US 234, 236, *supra),* the discovery must be inadvertent, and it must be "immediately apparent to the police that they have evidence before them" *(Coolidge v New Hampshire,* 403 US 443, 466, *supra).* The measure for such "apparency" has been clearly articulated; there must be "probable cause to associate the property with criminal activity" *(Payton v New York,* 445 US 573, 587, *supra).* In the case at bar the detective testified that when he saw the note, the word "Timmy" caught his eye. "Timmy" is the husband's name. The detective then picked up the letter to read it, and it said something to the effect that "your kids are gonna suffer for what you do." If there remains any question as to whether the detective was "searching", it is answered at this point. When the detective picked up the note to read it, he was, under any definition, searching. The fact is that the word "Timmy", alone, means nothing. The incriminating nature of the note was not "immediately apparent" to the detective. The word "Timmy" is barely suggestive of anything. For all the detective knew when he picked it up, the note was a love letter. Not only was it not immediately apparent that the note was evidence, but the discovery that the note was incriminating, after the detective picked it up and read it, can scarcely be described as "inadvertent" (see *United States v Berenguer,* 562 F2d 206, 210). This court has steadfastly refused to hold that a police officer may examine an item, where it was initially seen in plain view, to determine if it is evidence or not. The incriminating nature of the evidence must first be apparent before the item can be picked up and examined *(People v Richie,* 77 AD2d 667; *People v Haas,* 55 AD2d 683). Even if we were to change our position to hold that where an officer reasonably suspects that an item in plain view may be evidence or contraband, he can then briefly examine it to determine if there is probable cause to seize it, as some authorities and courts have suggested (see, e.g., *People v Jenkins,* 77 AD2d 353; *United States v Ochs,* 595 F2d 1247, 1257, n 8; 2 LaFave, Search and Seizure, A Treatise on the Fourth Amendment, § 6.7, subd [b]), the detective's action in this case was still impermissible. The word "Timmy", as noted, meant nothing. All it indicated was that the note was to, or about, or from, "Timmy". The detective could not reasonably suspect, on seeing only the name, that the note had any relevance to the crime. For all of the above reasons the note in question should have been suppressed. Since the question of defendant's intent was a close one in this case, the admission of the note was hardly harmless error (see *People v Crimmins,* 36 NY2d 230, 237). A new trial should be given defendant.