OPINION OF THE COURT
Donald J. Mark, J.
This is an application by the defendant, who is charged with arson, third degree, pursuant to CPL 710.20 (1), to suppress the testimony of Investigator Stephen Mancini upon the ground that the investigator obtained the information about which he intends to testify as the result of an illegal search.
A hearing was held relative to this issue at which the following facts were presented:
*839 On February 9, 1989, at approximately 8:47 p.m., a fire at the Paradise Restaurant was reported to the Rochester Fire Department, and members of the Fire Investigation Unit responded to the scene. These individuals were unaware at the time that the building was owned by a corporation and leased by Evangelos Trakosis, the defendant Ellie Khatib’s[1] father. The defendant and her husband Michael Khatib[1] were interviewed by Investigator William Stacy, Jr., and they both identified themselves as the operators of the restaurant. Another investigator, Abraham Crews, requested Khatib to execute an affidavit of ownership and a consent to search, and the latter signed both documents.
The affidavit of ownership identified Khatib as the "renter” of the property; the consent authorized the Unit "to conduct a complete search * * * for the purpose of discovering the cause and origin” of the fire. Crews told Khatib that the consent would allow the investigators to reenter the building at a later date, if necessary, to pursue a cause and origin investigation. Crews did not inform Khatib that he had a right to refuse to consent but the form he signed contained such language. At approximately 11:30 p.m. that same evening, Lieutenant Stephen McClary conducted a cause and origin investigation and concluded that the origin of the fire was suspicious and that the investigation should be continued.
The next day McClary directed Investigator Robert Bacon to continue the investigation, but Bacon was unable to comply because the restaurant had been boarded by the DeCarlo Boarding Co. and was locked at the time. Ms. Melanie Czebatul approached the authorities on the same day and informed McClary and Stacy that the defendant had discussed with her the defendant’s financial problems and her intention to start a fire at the restaurant. Bacon returned to the restaurant on February 11, 1989, but the building was still boarded and locked; no further efforts to investigate were made on the next two days. All attempts by the Unit’s personnel to contact Khatib during this period proved fruitless. John Yanus, a private arson investigator, was retained on February 13, 1989, to investigate the fire on behalf of the insurance company with which Trakosis was insured for the contents of the restaurant.
*840 On February 14, 1989, Yanus met with the defendant and Khatib and Khatib signed a consent for Yanus, after Yanus had informed him that he had the right not to consent. Yanus disclosed to the couple that he would initiate his investigation the next day, and he later made this same disclosure to McClary. Yanus entered the restaurant on February 15, 1989, with a key which he had obtained on a prior occasion from the DeCarlo Boarding Co. McClary dispatched Investigator Stephen Mancini to the restaurant on the same day, and Yanus was alone on the premises when Mancini arrived at approximately 9:30 a.m. Mancini entered the building through a door left unlocked by Yanus, and upon the completion of his investigation he concluded that the cause of the fire was arson.
The consent executed by Khatib at the scene of the fire on February 9, 1989, was the only consent obtained by the Unit between February 9, 1989, the date on which McClary conducted his investigation, and February 15, 1989, the date on which Mancini performed his investigation. There was never any application made for a search warrant during this period, as all the investigators assumed that the consent signed by Khatib justified both entries of the Unit personnel into the building.
Thus, the admissibility of the determination made by Mancini depends upon the continued vitality of Khatib’s consent for six days and/or the consent given to Yanus by Khatib enuring to the benefit of Mancini.
The defendant argues that Mancini’s observations and conclusions elicited from his investigation at the restaurant on February 15, 1989 must be suppressed as the result of an illegal search, because (A) Khatib’s consent was involuntary; (B) the consent should have been executed by Trakosis, the tenant of the premises, instead of Khatib, the operator of the business; (C) the nature of the investigation changed from investigatory to accusatory on February 10, 1989; (D) Khatib’s consent terminated with McClary’s investigation on February 9, 1989; and (E) the consent by Khatib to Yanus did not authorize Mancini’s search on February 15,1989.
(a) the involuntariness of khatib’s consent
In support of the defendant’s claim that Khatib’s consent was involuntary, the defendant points out that at the time Khatib executed the consent he was emotionally upset; that the consent was signed either in Crews’ official vehicle which *841 had self-locking doors in the rear compartment or outside on a bitterly cold, windy night; that Khatib was intimidated by the presence of many fire investigators and firefighters; and that Khatib was not orally advised of his right to refuse consent.
Neither the defendant nor Khatib testified at this hearing, and while there are cases in which appellate courts have found a consent involuntary solely from the testimony of police witnesses (see, e.g., People v Guzman, 153 AD2d 320), this should not be the situation here.
There was no showing that Khatib’s mental condition was affected by the defendant’s emotional state, but if it were, this should not affect the voluntariness of his consent (see, People v Medina, 123 AD2d 331). The fact that the Khatibs may have been in an official vehicle with self-locking doors does not render the consent involuntary (see, People v Close, 90 AD2d 562), especially since there was no screen separating the front and rear compartments; if they were outside, they were certainly not in custody (see, Matter of Kwok T., 43 NY2d 213). Khatib should not have been intimidated by the presence of a normal complement of fire personnel performing their duty to suppress a fire (see, People v Todd, 134 Misc 2d 988, affd 149 AD2d 826). While the failure to inform an individual of his right to refuse consent is a factor to consider (People v Gonzalez, 39 NY2d 122), it is not always imperative (People v Oates, 104 AD2d 907; People v Joynes, 72 AD2d 799), and the consent form Khatib signed included that admonition anyway.
Under the totality of the circumstances test formulated by the United States Supreme Court in Schneckloth v Bustamonte (412 US 218) and upon the application of the four factors enunciated by the Court of Appeals in People v Gonzalez (supra), Khatib’s consent was voluntary.
(b) khatib was not proper person to sign the consent
The defendant’s contention that Khatib’s consent was invalid since he was only one of the operators of the restaurant business, and that Trakosis as the tenant of the building was the only individual capable of executing a valid consent can be summarily rejected.
Here, Khatib and the defendant identified themselves as the operators of the business, Khatib executed an affidavit of ownership in which he listed himself as the "renter” of the property, these two documents were signed in the presence of the defendant and the defendant interjected no objection *842 during this entire proceeding.[2] All the law requires is reliance in good faith on the apparent capability of an individual to consent to a search and circumstances reasonably indicating that the individual does in fact have the authority to consent (People v Adams, 53 NY2d 1, cert denied 454 US 854; People v Anderson, 146 AD2d 638; People v Stevens, 140 AD2d 920).
The circumstances here are consistent with the requirements of these cases, so Khatib’s consent was a valid one.
(C) THE TERMINATION OF KHATIB’S CONSENT BY THE CHANGE IN THE DEFENDANT’S STATUS
The defendant asserts that when the fire investigation was transformed from the investigatory stage on February 9, 1989, the date of the fire, to the accusatory stage on February 10, 1989, the date Czebatul incriminated the defendant, Khatib’s consent was terminated and any further entry into the building required a search warrant.
There is support for this position in the case law.
In People v McNeeley (77 AD2d 205), the defendant, whose infant daughter had drowned in the bathtub, signed a consent to search on April 21, 1976, and on that date the police entered her house and conducted tests in the bathtub. Later in the same day the defendant admitted she killed her daughter when confronted with an autopsy report. The police seized the bathtub on April 28, 1976, without a warrant. The appellate court found this seizure illegal in these words (77 AD2d, supra, at 209): "Considering the changed circumstances between the time of the consent and original search and the time at which the bathtub was taken, the ample opportunity the police had during the six days [sic] to obtain a warrant, and the form signed by the defendant explicitly stating that the search was to take place within two hours of signing, we find the taking of the bathtub may have been illegal and, if so, should have been suppressed at trial” (emphasis added).
A court in a sister State came to a similar conclusion in State v Brochu (237 A2d 418 [Me]). There, the defendant consented to a search of his home at a time when the police did not know whether his wife’s death by poisoning was *843 accidental or a criminal homicide. The court held that this consent did not authorize a second search of the premises the following day after the defendant’s arrest for murder. The court disapproved of the concept that this consent to search remains viable and valid until specifically revoked or its purpose accomplished and noted that the assumption of continuing consent would be particularly inappropriate on these facts because between the consent and the second search "the defendant had ceased to be the husband assisting in the solution of his wife’s death and had become the man accused of his wife’s murder” (237 A2d, supra, at 421).
Except for the two-hour limitation in McNeeley (supra), a factor on which the court did not seem to really focus, these two cases are very similar to the instant case. The defendant is therefore on firm ground when she claims that Khatib’s consent came to an end when she became an arson suspect on February 10, 1989.
(d) the termination of khatib’s consent with mgclary’s investigation
The defendant contends that Khatib’s consent terminated with McClary’s investigation on February 9, 1989, since the purpose of the consent had been accomplished. The People respond quite logically that the language of the consent, viz., "to conduct a complete search * * * for the purpose of discovering the cause and origin” of the fire, authorized a continuing search until the cause and origin of the fire was ascertained, since McClary’s investigation did not result in a definite conclusion. The People further answer, and again quite logically, that the statement by Crews to Khatib that the consent would allow investigators to reenter the building at a later date, if necessary, to pursue a cause and origin investigation, also constituted authorization for a continuing search.
One legal writer stated flatly that "Except in unusual circumstances, it would seem that a consent to search may be said to be given upon the understanding that the search will be conducted forthwith and that only a single search will be made” (3 LaFave, Search and Seizure § 8.1 [c], at 170).
However, there is authority in this State and in other jurisdictions, apparently because of the "unusual circumstances” referred to by LaFave, where a second search has been upheld based upon the original consent when it occurred within a reasonable time (People v Dancey, 84 AD2d 763, affd *844 57 NY2d 1033 [second search on the same day]; People v Updike, 125 AD2d 735 [second search on next day]; People v Aponte, 124 AD2d 489 [second search on same day]; Ferguson v Caldwell, 233 Ga 887, 213 SE2d 855 [second search four hours later on same day]; People v Nawrocki, 6 Mich App 46, 148 NW2d 211 [second search on same day]), or where the search was not conducted almost contemporaneously but was found proper nevertheless (State v Williams, 67 NC App 519, 313 SE2d 236, cert denied 311 NC 308, 317 SE2d 909 [search 23 hours after consent]; Gray v State, 441 A2d 209 [Del] [search 20 hours after consent]; United States v White, 617 F2d 1131 [search conducted two days after consent]).
The six-day period in this case from the time the consent was given on February 9, 1989, to the time of Mancini’s investigation on February 15, 1989, would not be a reasonable interval in view of this body of case law.
The case most on point in New York is People v Garcia (63 AD2d 704). In that case, on Friday the defendant’s common-law wife, Lucy Allende, requested the police to remove the defendant’s drug supply from their apartment. When Detective Scagnelli asked Allende for permission to search the apartment she responded: " 'Yes, I’ll show it to you * * *. You can come now or you can come at any time.’ ” (Supra, at 705.) Scagnelli then went to the apartment with Allende and was shown the drugs belonging to the defendant. The police returned to the apartment on the following Monday, and Allende signed a consent to search form prepared by Scagnelli. The majority opinion concluded that the seizure of the drugs on Monday was valid based on Allende’s written consent on Monday, without mentioning the oral consent on Friday permitting a search then or any time in the future. The dissenter found the written consent involuntary because of a coercive atmosphere created by the police. He then opined: "the consent to search the apartment 'now’ or 'at any time’ cannot be unequivocally construed to mean that permission was given for either multiple searches or a continuing search in futuro. At most it constituted permission to conduct a single search of the apartment, either then or at some foreseeable time thereafter.” (Supra, at 705.) He further stated: "the consent given by Ms. Allende to search the apartment without a warrant on July 18 could not be used to justify the search on July 21 (and the majority do not contend otherwise)” (supra, at 705).
The consent in Garcia (supra) allowing a search "now” or *845 "at any time” can be equated with the consent here, allowing a search "for the purpose of discovering the cause and origin” of the fire, and the proviso that such consent would authorize reentry at a later date. Based upon the reasoning in that case, the consent in this case ended with the completion of Mc-Clary’s investigation.
Another State court has come to a similar conclusion in an arson situation. People v Shelton (110 Ill App 3d 625, 442 NE2d 928) found that the consent to a search of a burned car by a fire inspector on October 17 did not cover a second search on October 30, as the consenting party would have believed that the purpose of the consent was fulfilled by the earlier search and therefore would have had no reason to make a formal revocation.
Although there is apparently no New York case law in two other relevant areas, one State court has rejected the proposition that a consent to search remains valid and viable until specifically revoked or its purpose accomplished (State v Brocha, supra), and another State court has held that where the owner of the house rendered uninhabitable by fire had boarded it up, it demonstrated her expectation of privacy as to the interior of the house and its contents (Swan v Superior Ct., 8 Cal App 3d 392, 87 Cal Rptr 280). The application of these principles to this case is self-evident, and it supports the defendant’s position.
Thus, the defendant’s argument that Khatib’s consent came to an end with McClary’s investigation is persuasive.
(e) khatib’s consent to yanus did not AUTHORIZE MANCINl’S INVESTIGATION
The final argument of the defendant on the issue of the vitality of Khatib’s consent is that the consent of Khatib to Yanus did not revive or continue the first consent of Khatib.
The only manner in which the conclusion may be reached that an individual’s consent was a continuing one is if the consenting individual’s status has not changed and he makes an effort to continue the earlier posture (State v Fredette, 411 A2d 65 [Me]). There the defendant summoned the police to her home and told them an intruder had shot her husband. After the death of the defendant’s husband she indicated her continued interest in the police pursuing the investigation at her home in an effort to find clues about the alleged assailant. The police secured the residence from the time of their initial *846 entry on May 26, 1978, until May 29, 1978, during which time the defendant expressed an interest in the progress of the search and never objected to the continued police presence. On this state of facts the court concluded that the defendant had consented to continuing searches at her premises.
That can hardly be called the situation here. While Khatib’s status did not change, the status of his wife, the defendant, was certainly transformed; she became the target of an arson investigation on February 10, 1989, when Czebatul gave a statement to the fire investigators about the defendant’s involvement in the fire. The structure was boarded up without any notice to the Unit, so the investigators were denied access to the building. Khatib made no effort to contact the investigators, and he was unavailable when they tried to contact him. These are indications that Khatib did not have an unabated interest in the continuation of the initial investigation. Khatib merely executed a consent to Yanus because the latter was conducting an investigation for the insurance company which had insured the contents of the restaurant. That consent did not justify Mancini’s intrusion into the building through the door left unlocked by Yanus.
Thus, the findings of Mancini must be suppressed because the nature of the investigation changed, Khatib’s consent terminated on February 9, 1989, and Khatib’s consent to Yanus did not operate to validate Mancini’s investigation.
Accordingly, the application of the defendant to suppress Investigator Stephen Mancini’s findings on February 15, 1989, is granted.
[Portions of opinion omitted for purposes of publication]

. The defendant Ellie Khatib will be referred to throughout this opinion as "the defendant”; the defendant’s husband Michael Khatib will be referred to as "Khatib”.

. The defendant’s claim of standing went unchallenged by the People. It would be an anomaly to permit her to assert a right of privacy in the premises sufficient to bring this motion (see, People v Wesley, 73 NY2d 351), at the same time she disavows the propriety of documents in which executions she participated.