MLR|SC#136-17

STATE OF MAINE                                    CR-15-1273
KENNEBEC, ss


STATE OF MAINE

v                          **ORDER ON MOTION TO SUPPRESS**

RANDY R. MARQUIS


Before the Court is a motion brought by Defendant seeking suppression of statements and digital evidence obtained when members of the Maine State Police entered the Defendant's home in Augusta on January 15, 2015.

Law enforcement did not have a warrant when they entered, but the State argues that the Defendant consented to the entry, as well as to the seizure and search of his computer. The State also argues that he was not in custody at the time he made incriminating statements and that the statements were otherwise voluntary. The Defendant argues that consent to enter the residence, and for seizure and search of his computer, were not voluntary given deceit and misrepresentations made by the officers. He further argues that *Miranda* warnings were required before questioning the Defendant. While the Defendant did raise the issue of the voluntariness of his statements in paragraph 4 of the motion, he did not argue this issue in his brief and the court finds that the issue has been waived.

1

Amru To Danthes 1/11/2017

The State is represented by Assistant District Attorney Frayla Tarpinian, and the Defendant is represented by Attorney Scott Hess. The Court has reviewed the testimony from the October 3, 2016 hearing on the motions, including the audio recording[1] and other exhibits. It has also reviewed the parties' written arguments, the last of which were received by the Court on October 7, 2017. However, because the Court could not tell from the audio recording when law enforcement made entry into the Defendant's home, the parties by agreement supplemented the motion hearing record by written stipulation received by the Court on January 4, 2017. The Court has now reviewed that stipulation, and issues the following order denying the motion.

## FINDINGS AND CONCLUSIONS

Special Agent (SA) Scott Kittredge of the Maine State Police came to the Defendant's residence on Northern Avenue in Augusta on January 15, 2016. He knocked on the door, and the Defendant answered. SA Kittredge immediately told him that he worked for the State Police. According to the Stipulation received by the Court on January 4, 2017, the Defendant responded to the knock on the door at approximately 2:05 into the recording. There was an exchange between the Defendant and SA Kittredge that lasted approximately 25 seconds, at which time SA Kittredge enters the residence and tells the Defendant that he went there to speak with the Defendant's father, Paul Marquis. The Defense claims that there were three law enforcement officers on the front steps at the time entry was made but the State disagrees. Based on the record before the Court it is

[1] The Defense prepared an unofficial transcript of the interactions between law enforcement and the Defendant and members of his family. The Court found the transcript to be roughly accurate but was able to hear portions of the

not possible to make a finding in regard to how many officers were present on the steps at the moment entry was made.

SA Kittredge identifies his purpose as being to find out if Paul Marquis' taxi company had any "problems" on Christmas Day. When they deny there were any, he immediately tells them[2] that there was "something else" he hoped they would help him out with. He tells them that they had "observed some unusual files coming through this network".[3] When he asks if they know what he is talking about, the Defendant readily responds, "Yeah I know what you are talking about." He tells SA Kittredge that he uses "Limewire" but that he cannot control what comes in. He states that "every time I get it I just delete it." SA Kittredge asks how many computers the Defendant uses and is told that he uses just one. He is asked if SA Kittredge can look at it and the Defendant responds, "Yeah." The Defendant goes on to tell him that he has gotten "a few" of the files, but that he does not store them. SA Kittredge tells him that he does not have a search warrant to search the computer, "you don't have to allow me to, but I would like to search and make sure that what you are telling me is accurate." The Defendant responds with, "Yeah, ok." The Defendant explains that what he looks for usually are pictures of the "girls from Charmed" who they both seem to agree are "sorta like younger, not like younger girls." Again, SA Kittredge tells the Defendant that he does not have a search warrant. He states, "You have given me consent, even though you don't have to give me your consent to search your computer." The Defendant replies, "I have no problem with that." All of these exchanges occur within approximately 7 minutes of entry of the residence.

---

[2] At this point in the recording, SA Kittredge is speaking not only to the Defendant and his father, but a woman named Roxanne, another family member.

[3] The Defense Memorandum states that law enforcement had obtained a Grand Jury subpoena to identify the subscriber for a certain IP address through which several images of child pornography had been downloaded. That subscriber was Paul Marquis, the Defendant's father.

SA Kittredge and the Defendant start through the files and the Defendant answers each and every question about the computer and also provides biographical and household information. The Defendant assures him that no one else uses the computer besides him. The Defendant's wife Tammy then enters the room and SA Kittredge informs her that "apparently somehow" her husband had acquired child pornography files, but that he is claiming that he has "successfully gotten rid of them." He tells Tammy that he wants to be sure that what her husband has told him is accurate.

The next part of the exchange consists of SA Kittredge going through individual images with the Defendant, and within a few minutes the Defendant is told that the reason SA Kittredge has the files on his computer is that they have been monitoring the internet "over a number of days, including Christmas being one of them" and that it was clear that "this is happening repeatedly." He then tells the Defendant that the search he is conducting is "getting hits on tons and tons of pictures." The Defendant is then told that SA Kittredge does not think he is a really bad guy "but I need to find out what kind of guy you are." When the Defendant insists that he has no interest in children, SA Kittredge tells him he does not believe him. He also tells him that he is OK with that, so long as the Defendant is not hurting anybody in the home, presumably referring to the minor occupants.

The exchange continues with SA Kittredge saying, "here is what I am going to do...because you gave us permission to search...I am going to take it back, if you are willing to give me consent, I am going to take it back to the laboratory and do a more thorough search for illegal files." The Defendant is asked "Do you mind if I take that?" which apparently refers to a "little sd card" to which the Defendant mutters his assent.

4

At this point, the Defendant's father joins the exchange, and SA Kittredge informs him that he has found over 100 child pornography files on his son's computer. He states, "since you have been so cooperative, ....I am going to take that computer with me.... I am going to search the computer as well as this little sd card that was attached to it thoroughly for child pornography files...at our laboratory where we can do an accurate job without bothering you guys. So at the moment do you have any questions for me?" The Defendant replies, "I really don't know what to ask." SA Kittredge then asks his father questions about who resides in the house, particularly the names and ages of the minor children.

SA Kittredge then hands them a receipt for the laptop and sd card, as well as a consent form. He tells them the form says that "you were willing to give me and those who work with me consent to search those items for illegal contraband specifically child pornography. So since I am a law enforcement officer with the State Police I am going to search for those things. You don't have to let me, if you are willing to give me consent I would like you sign right here for me. And I am going to give you a copy because it also serves as your receipt." The Defendant's response is to ask for "today's date." He signs the consent form which was admitted as State's Exhibit 2. SA Kittredge asks the Defendant's father about where his other son is and is told that he is not home, but that his wife Kathryn is present. He asks to speak with her privately and the Defendant asks "Need me to leave?"

SA Kittredge's last exchange with the Defendant is to ask if he has any questions, to which Defendant replies "No, I am good." SA Kittredge then speaks with Kathryn

briefly to make sure that none of the children in the home were endangered by the Defendant's possession of the child pornography.

At the hearing, SA Kittredge and Lieutenant Glenn Lang[4] of the Computer Crimes Task Force testified that the Defendant was not immediately arrested at the conclusion of the interview. Lieutenant Lang testified that he made the decision to have officers return to the residence after they spoke briefly outside at their vehicles, and the "command decision" to arrest was made by him based upon the presence of minor children in the household.

The Court next addresses the legal issue of "custody" and voluntariness of the consent given.

### *Whether the Defendant was in custody for purposes of Miranda*

The Law Court has established 10 different factors for courts to consider when determining whether a person has been subjected to custodial interrogation, triggering the constitutional requirement that the person be provided so-called *Miranda* warnings. *State v. Kittridge*, 2010 ME 90. The factors are to be considered "in their totality, not in isolation, and the State has the burden to prove that the Defendant was not in custody by a preponderance of the evidence. *Id. at* ¶17. The factors are as follows:

1) the locale where the defendant made the statements;

2) the party who initiated the contact;

3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

4) subjective views, beliefs, or intent that the police manifested to the defendant,

---

[4] Detective David Armstrong also testified but he was positioned near the entrance to the residence and did not hear SA Kittredge's conversation with the Defendant.

to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

6) the focus of the investigation (as a reasonable person in the defendant' position would perceive it);

7) whether the suspect was questioned in familiar surroundings;

8) the number of law enforcement officers present;

9) the degree of physical restraint placed upon the suspect; and

10) the duration and character of the investigation.

The Court finds that factor 2 and 6 weigh in favor of a finding of custody. Clearly the contact was initiated by law enforcement, and while SA Kittridge indicated when he first entered the residence that he went there to speak to the Defendant's father, it quickly became clear the Defendant was the focus of the investigation.

The Court finds that factors 1, 3, 4, 5, 7, 8 9, and 10 would weigh against a finding of custody. The Defendant was in familiar surroundings, at his residence, and there were many family members present (#1 and #7). The State did not in the Court's view have probable cause to believe that the Defendant was himself in possession and control over prohibited images until the Defendant made the statements (#3).

Special Agent Kittredge made no statements and committed no physical act that would suggest that to the Defendant that he was not free to leave (#4). The Defendant

7

argues that the deception used by SA Kittredge, namely his statements that he was there to find out if the taxi service run out of the residence had encountered problems of some unspecified nature on Christmas day, weighs in favor of the interview being custodial. While it does appear that the statements were a ruse, it should be noted that almost immediately upon the initial deception, SA Kittredge tells him that law enforcement suspected that child pornography had been transmitted to an IP address at the residence. It is not at all clear from the record, including from the Defendant's testimony, that the Defendant even understood at the relevant time that he had been the subject of deception, much less whether or how the deception would have affected a reasonable person's belief that he or she was not free to leave. In addition, the Defendant did not say or do anything which resulted in Special Agent Kittredge responding with words or conduct that would suggest to a reasonable person that he or she could not leave (#5). There is some dispute between the parties as to how many law enforcement officers were at the scene. The Defendant testified that there were five law enforcement officers in three vehicles. The State witnesses testified that Lieutenant Lang had only peripheral contact with the Defendant, and Detective Armstrong was largely out of the Defendant's view. Two other individuals were actually civilian employees of the Task Force who had no presence in the residence. The Court finds that considering the pace and demands of the colloquy between the Defendant and Special Agent Kittredge, as well as the presence of other family members, it is unlikely that a reasonable person in the position of the Defendant would have focused upon the brief presence of Lieutenant Lang and other law enforcement officers who never entered the residence.(#8). Clearly, no physical restraint

8

of any kind was used, and the entire length of the investigation was less than 44 minutes. (#9 and #10).

Based on these findings, the Court concludes that the State has proven by a preponderance of evidence that the Defendant was not in custody. The circumstances of the interrogation were not "custodial" such that there was a restraint on his freedom of movement to the degree associated with formal arrest.

*Whether the Defendant's consents to enter the residence, and to search and seize his computer, were voluntary*

The Defendant argues that entry into his residence was illegal because the Defendant did not affirmatively consent to the entry. The Court finds that SA Kittredge did not expressly ask to be allowed to enter, but that the Defendant and his father acquiesced to the initial entry. The State has the burden of demonstrating by a preponderance of evidence that an objective manifestation of consent was given by a person "by word or by gesture" in the absence of express consent. *State v. Bailey*, 2010 ME 15, ¶ 19, citing *State v. Fredette*, 411 A.2d 65, 68 (Me. 1979). The Law Court has also held that an individual may be found to have consented by "assisting and cooperating" with the authorities despite the absence of express consent. *State v. Cress*, 576 A. 2d 1366, 1367 (Me. 1990). The Court finds that the Defendant voluntarily opened the door to his residence and let SA Kittredge in. He does not really argue the point, but seems to argue that because SA Kittredge did not ask to enter and receive an affirmative answer, that he did not consent to the entry. The Court could find no case in which it has been held that a law enforcement officer who knocks on an individual's door, and is

9

allowed to cross a residential threshold by the occupant as they are conversing in a friendly way, violates the Constitution. The Court finds that the Defendant "assisted and cooperated" with SA Kittredge through his conduct when he freely let him enter his residence after identifying himself as a law enforcement officer.

The Defendant also argues that the entry was illegal because it was made after SA Kittredge made deceptive statements about his purpose. The Court would note, however, that the recording when reviewed with the Stipulation establishes that the statements made by SA Kittredge regarding the taxi company were made after the initial entry was made. In other words, this refutes the Defendant's argument that entry was allowed as a response to deception, and the Court rejects the Defendant's argument that all evidence obtained by law enforcement after the initial entry was obtained in violation of Defendant's 4th Amendment rights.

With respect to the search of Defendant's computer, the Court finds that the State has proven by a preponderance of evidence that the Defendant consented to the search of its contents several times. As noted previously, within 7 minutes of entry the Defendant says to SA Kittredge "Yeah"; "Yeah ok"; and "I have no problem with that" each time the officer asks to search the computer.

Finally, as to the seizure or taking of the computer, the Defendant orally assents to the taking, then consents in writing to its seizure. The Defendant continues to "assist and cooperate" with law enforcement in this seizure, and is invited to ask any questions he might have, to which he states he has none. When SA Kittredge begins to speak to Kathryn about the seizure, his cooperation is manifests as he asks SA Kittredge if he would like him to leave the two alone so they could talk privately.

While the Defendant argues that the deception used by SA Kittredge shortly after initial entry into the residence voids any consent, the Court finds based on the totality of the circumstances that the Defendant voluntarily consented to the search and seizure of this computer. There is no direct or even indirect evidence of doubt or reconsideration on the Defendant's part after he gives his consent verbally, by gestures, and by other conduct. The Court finds that the deception that was used was fleeting, and the Court finds that it had little or no impact on the Defendant's decisions made later in the interview to consent to the search and seizure of his computer. This case is therefore distinguishable from the facts in *State v. Bailey* as the deception in that case pertained to the purpose given by law enforcement for the search of Bailey's computer. In this case, the Defendant was clearly informed that law enforcement was seeking to locate child pornography on Mr. Marquis' computer. Objectively viewed, he consented to law enforcement's search and seizure of it after truthfully being informed about the scope of their search. *Bailey,* ¶ 28.

The entry will be: The Defendant's Motion to Suppress statements made by him on January 15, 2015, as well as the contents of his computer is DENIED.

_____
DATE

_____
SUPERIOR COURT JUSTICE

11